**2024-1792**

# United States Court of Appeals for the Federal Circuit

**10TALES, INC.,**
*Plaintiff-Appellant,*

– v. –

**TIKTOK INC., TIKTOK PTE. LTD., BYTEDANCE LTD. and BYTEDANCE INC.,**
*Defendants-Appellees.*

*On Appeal from the United States District Court for the Northern District of California, Case No. 5:21-cv-03868-VKD*

## CORRECTED BRIEF FOR APPELLANT

THOMAS J. FISHER
BARRY P. GOLOB
COZEN O'CONNOR
2001 M Street, NW, Suite 500
Washington, DC 20036
(202) 912-4800
tfisher@cozen.com
bgolob@cozen.com

*Counsel for Plaintiff-Appellant*

SEPTEMBER 5, 2024
CORRECTED FILED: DECEMBER 27, 2024

CP COUNSEL PRESS     (800) 4-APPEAL • (332544)

## <u>FEDERAL CIRCUIT RULE 32(A)(3) STATEMENT</u>

### Claim 1 of U.S. Patent No. 8,856,030

1.  A system for associating user attributes with digital media asset attributes and creating a user specific composite digital media display, the system comprising:

a) a server;

b) a computer-readable storage medium operably connected;

c) wherein the computer-readable storage medium contains one or more programming instructions for performing a method of associating user attributes with digital media asset attributes and creating a user specific composite digital media display, the method comprising:

identifying a first set of digital media assets stored on the computer-readable storage medium,

creating, from the first set of digital media assets, a first composite digital media display,

presenting to the user via a display server, the first composite digital media display;

retrieving user social network information from at least one source external to the presented first composite digital media display, wherein the user social network information contains one or more user attributes;

selecting, based on the user attributes in the social network information, a second set of digital media assets, wherein the second set of digital media assets is associated with one or more user attributes found in the user social network information;

monitoring the first composite digital media display for the presence of a trigger, wherein the trigger indicates a personalization opportunity in the first set of digital media assets;

performing a rule based substitution of one or more of the digital media assets from the first set of digital media assets with one or more of the digital media assets from the second set of digital media assets to create a user specific set of digital media assets;

creating, from the user specific digital media assets, a user specific composite digital media display; and

presenting to the user via the display server, the second composite digital media display.

Appx59-60, 20:62-22:14.

## UNITED STATES COURT OF APPEALS
## FOR THE FEDERAL CIRCUIT

### <u>CERTIFICATE OF INTEREST</u>

**Case Number**:    <u>2024-1792</u>

**Short Case Caption**:    <u>*10Tales, Inc. v. TikTok Inc.*</u>

**Filing Party/Entity**:    <u>10Tales, Inc.</u>

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: <u>December 27, 2024</u>    Signature:  <u>*/s/ Thomas J. Fisher*</u>

                                 Name:    <u>Thomas J. Fisher</u>

1.    **Represented Entities.**  Provide the full names of all entities represented by undersigned counsel in this case. Fed. Cir. R. 47.4(a)(1).

    10Tales, Inc.

2.    **Real Party in Interest.**  Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities. Fed. Cir. R. 47.4(a)(2).

    None/Not Applicable

3.    **Parent Corporations and Stockholders.**  Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities. Fed. Cir. R. 47.4(a)(3).

    None/Not Applicable

4.    **Legal Representatives.**  List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

David M. Stahl, Cozen O'Connor
Samuel A. Lewis, Cozen O'Connor
Nathan Dooley, Cozen O'Connor
William E. Davis, III, Davis Firm, P.C.
Rudolph Fink, IV, Davis Firm, P.C.
Andrew M. Hutchison, formerly of Cozen O'Connor
Eric Levi, formerly of Cozen O'Connor

5.  **Related Cases.**  Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

Ex Parte Reexamination of U.S. Patent No. 8,856,030, Reexamination Control No. 90/015,310, United States Patent and Trademark Office.

6.  **Organizational Victims and Bankruptcy Cases.**  Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees).  Fed. Cir. R. 47.4(a)(6).

None/Not Applicable

# <u>TABLE OF CONTENTS</u>

**Page**

JURISDICTIONAL STATEMENT ..................................................................1

STATEMENT OF THE ISSUES....................................................................2

STATEMENT OF THE CASE........................................................................3

    A.    The State of the Art at the Time of the '030 Patent Invention..............3

    B.    10Tales' Patented System and Its Technological Improvements ........5

    C.    The Prosecution of the '030 Patent ....................................................11

    D.    TikTok's Denied Petition for *Inter Partes* Review of the '030 Patent ................................................................................................13

    E.    Claim Construction of the '030 Patent................................................14

    F.    The District Court Grants TikTok's Rule 12 Motion ........................16

SUMMARY OF ARGUMENT ......................................................................17

ARGUMENT ................................................................................................21

    I.    Standard of Review ...........................................................................21

    II.    Claim 1 of the '030 Patent Passes *Alice* Step One Because It Is Directed to Patent Eligible Subject Matter.........................................23

        A.    The District Court Erred in Its *Alice* Step-One Analysis by Failing to Consider the Claim as a Whole in the Context of the '030 Patent Specification ....................................................25

        B.    Claim 1 Is Directed to a Specific Improved System and Not to an Abstract Idea That Would Preempt Further Discovery ...35

        C.    Claim 1 Is Directed To A Patent Eligible Improvement To Prior Art Systems For Presenting Digital Media Content ........37

    III.    Claim 1 of the '030 Patent Passes *Alice* Step Two Because It Includes an Inventive Concept That Is a Technical Improvement Over Existing Technological Processes ...............................................42

CONCLUSION ............................................................................................59

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Affinity Labs of Texas, LLC v. Amazon.com Inc.*,
838 F.3d 1266 (Fed. Cir. 2016) .......................................................34

*Alice Corp. Pty. Ltd. v. CLS Bank Int'l*,
573 U.S. 208 (2014).................................................................*passim*

*Am. Axle & Mfg., Inc. v. Neapco Holdings LLC*,
977 F.3d 1379 (Fed. Cir. 2020) .......................................................24

*Ancora Techs., Inc. v. HTC America, Inc.*,
908 F.3d 1343 (Fed. Cir. 2018) ...................................................40, 42

*BASCOM Global Internet Svcs., Inc. v. AT&T Mobility LLC*,
827 F.3d 1341 (Fed. Cir. 2016) .................................................*passim*

*Berkheimer v. HP Inc.*,
881 F.3d 1360 (Fed. Cir. 2018) .................................................*passim*

*Boquist v. Courtney*,
32 F.4th 764 (9th Cir. 2022) ............................................................22

*CardioNet, LLC. v. InfoBionic, Inc.*,
955 F.3d 1358 (Fed. Cir. 2020) .................................................*passim*

*Cellspin Soft, Inc. v. Fitbit, Inc.*,
927 F.3d 1306 (Fed. Cir. 2019) .......................................................23

*Chewy, Inc. v. Int'l Bus. Machines Corp.*,
94 F.4th 1354 (Fed. Cir. 2024) ........................................................34

*Coop. Entm't, Inc. v. Kollective Tech., Inc.*,
50 F.4th 127 (Fed. Cir. 2022) ..................................21, 22, 23, 49, 59

*CosmoKey Sols. GmbH & Co. KG v. Duo Sec. LLC*,
15 F.4th 1091 (Fed. Cir. 2021) ............................................33, 34, 54

*DDR Holdings, LLC v. Hotels.com, L.P.*,
773 F.3d 1245 (Fed. Cir. 2014) ..................................................37, 57

*Diamond v. Chakrabarty*,
    447 U.S. 303 (1980) ........................................................................23

*Diamond v. Diehr*,
    450 U.S. 175 (1981) ........................................................................49

*Durnford v. MusclePharm Corp.*,
    907 F.3d 595 (9th Cir. 2018) .........................................................22

*Enfish, LLC v. Microsoft Corp.*,
    822 F.3d 1327 (Fed. Cir. 2016) .......................................25, 33, 34, 37

*Finjan, Inc. v. Blue Coat Sys., Inc.*,
    879 F.3d 1299 (Fed. Cir. 2018) .......................................37, 38, 39, 40

*Free Stream Media Corp. v. Alphonso Inc.*,
    996 F.3d 1355 (Fed. Cir. 2021) .................................................34, 37

*In re Killian*,
    45 F.4th 1373 (Fed. Cir. 2022) .......................................................42

*Intellectual Ventures I LLC v. Erie Indem. Co.*,
    850 F.3d 1315 (Fed. Cir. 2017) ......................................................22

*Mayo Collaborative Servs. v. Prometheus Labs., Inc.*,
    566 U.S. 66 (2012) ...................................................................*passim*

*McRO, Inc. v. Bandai Namco Games America Inc.*,
    837 F.3d 1299 (Fed. Cir. 2016) .............................................20, 29, 30

*Microsoft Corp. v. i4i Ltd. P'ship*,
    564 U.S. 91 (2011) .....................................................................22, 23

*Peters v. Active Mfg. Co.*,
    129 U.S. 530 (1889) ........................................................................43

*Plaskett v. Wormuth*,
    18 F.4th 1072 (9th Cir. 2021) ........................................................22

*Research Corp. Techs. v. Microsoft Corp.*,
    627 F.3d 859 (Fed. Cir. 2010) ...................................................31, 48

*Smart Sys. Innovations, LLC v. Chi. Transit Auth.*,
  873 F.3d 1364 (Fed. Cir. 2017) ...........................................................24

*Trinity Info Media, LLC v. Covalent, Inc.*,
  72 F.4th 1355 (Fed. Cir. 2023) ......................................................*passim*

*Usher v. City of Los Angeles*,
  828 F.2d 556 (9th Cir. 1098) ...............................................................21

*Weisner v. Google LLC*,
  51 F.4th 1073 (Fed. Cir. 2022) ......................................................*passim*

*Whitaker v. Tesla Motors, Inc.*,
  985 F.3d 1173 (9th Cir. 2021) .............................................................21

**Statutes**

28 U.S.C. § 1295(a)(1) ...........................................................................1

28 U.S.C. § 1338(a) .................................................................................1

35 U.S.C. § 101 ...........................................................................*passim*

35 U.S.C. § 282 ................................................................................17, 22

**Other Authorities**

Fed. R. App. P. 12 ........................................................................*passim*

## STATEMENT OF RELATED CASES

Pursuant to Federal Circuit Rule 47.5, counsel for Appellant 10Tales, Inc. ("10Tales") provides as follows:

1.    There has been no previous appeal in this case.

2.    10Tales' patent at issue in this appeal—U.S. Patent No. 8,856,030 ("the '030 patent")—is currently involved in *ex parte* reexamination filed by Appellee TikTok Inc. pending under Control No. 90/015,310 before the United States Patent and Trademark Office.

## <u>JURISDICTIONAL STATEMENT</u>

The district court had jurisdiction pursuant to 28 U.S.C. § 1338(a) because this case involves a patent infringement action brought by Plaintiff-Appellant 10Tales, Inc. ("10Tales") against Defendants-Appellees TikTok Inc., TikTok Pte. Ltd., ByteDance Ltd., and ByteDance Inc. (collectively, "TikTok"). This Court has jurisdiction over this appeal pursuant to 28 U.S.C. § 1295(a)(1) because this is an appeal from final judgment and an order granting TikTok's motion for judgment on the pleadings. Appx1-22. 10Tales timely filed a notice of appeal on April 30, 2024.

## **STATEMENT OF THE ISSUES**

1.    The district court rejected TikTok's argument that claim 1 of the '030 patent is directed to the abstract idea of "targeted advertising" finding instead that it is "directed to a system for presenting personalized digital media content to a user based on the user attributes from user social network information."  But in its *Alice* step-one inquiry, the district court based its analysis on the claim being directed to simply "the abstract idea of providing personalized digital media content to a user," which would include "targeting advertising."  Did the district court error in oversimplifying claim 1 by failing to account for specific requirements of the claim as a whole in finding that it is directed to an abstract idea under *Alice* step one?

2.    The district court declined to draw reasonable inferences from the intrinsic and Rule 12 record in favor of 10Tales because, according to the district court, evidence of novelty and non-obviousness are irrelevant to the issue of patent eligibility.  Did the district court err in failing to recognize that after drawing all reasonable inferences in favor of 10Tales, there is at least a plausible factual dispute as to whether the specific combination of elements in claim 1 of the '030 patent includes an inventive concept that improves conventional methods for presenting personalized digital media content under *Alice* step two?

## STATEMENT OF THE CASE

### A.    The State of the Art at the Time of the '030 Patent Invention

The '030 patent (Appx23-60), entitled "Method, System and Software for Associating Attributes Within Digital Media Presentations," issued on October 7, 2014, based on a provisional application filed on April 7, 2003.  Appx23.  David Russek is the sole inventor of the '030 patent.  Appx23.

As illustrated in the timeline below from 10Tales' claim construction presentation to the district court, at the time of Mr. Russek's invention, none of the modern online social networks had yet launched.  *See* Appx2738, 6:7-15.  It was not until three years after the '030 patent application was filed—in 2006—that Twitter and Facebook were introduced.  That was the year before the first iPhone hit the market.  It was not until 2010 that Instagram was launched, and TikTok's now ubiquitous app—which was merged with the 2014 musical.ly app—was not introduced until 2016, and that was only in China.  TikTok was not launched in the U.S. until 2018.

10Tales—and its founder Mr. Russek—has been a pioneering developer of innovative technology used to deploy advanced storytelling through the use of 10-second videos submitted by a network of friends that become shared experiences among the friend network.  Appx86, ¶2.  In 2015, 10Tales was a finalist in two categories of the Mobile Excellence Awards:  Best Mobile Video and Best Delivery

Platform for Mobile.  Appx86-87, ¶2.



*See* Appx2738, 6:7-15.

The '030 patent describes conventional systems for providing a digital media narrative to users.  Before 10Tales' invention, conventional systems had drawbacks in "attract[ing] individuals to content that is personally more relevant and impactful for them."  Appx50, 2:3-4.

These drawbacks are described, e.g., in the context of shortcomings in conventional ad-placement systems that were being developed during the advent of the digital era.  Appx50, 1:52-61.  As technology was evolving, advertisers were confronted with the use of technology to avoid advertisements, e.g., by stopping pop-up ads or skipping over the ads.  Appx50, 1:52-61.  None of these systems, however, addressed how technology could be used to understand an individual's likes or dislikes or the individual's current mood to more appropriately adapt the content for

the individual.  Appx50, 2:7-11.  Showing his insight, Mr. Russek recognized that none of the conventional systems could "change the content of the digital media narrative based on user demographics, psychodemographics, emotional states, affinities (cognitive, emotional, and social), self-narrating content classification, internal narrative traits preference topology, time sensitive, episodic expectation sequencing, and collective/collaborative attributes."  Appx50, 2:55-61.  The system described in the '030 patent addresses these shortcomings.

At the time of the '030 patent, the state of the art included systems for delivering digital media content, and even systems for providing targeted advertisements to users.  But none of the conventional systems or technology provided a system that could **modify the content** being delivered to a user to make it more impactful for the user based on information about the user's affinities that is retrieved by the system based on that user's interactions within an online social network.  It is 10Tales' novel system described in the '030 patent that provided an advancement over existing digital media streaming systems in the nascent days of online social networks.

## B.    10Tales' Patented System and Its Technological Improvements

The '030 patent dates back to the nascent stages of online social networking. 10Tales and David Russek—who has a background in psychology—were the first to imagine a system for tapping into online social networking information to tailor

content for users to enrich their experience—and did so long before online social network services became part of our everyday life.

The '030 patent describes existing systems for providing digital media content to users. Before 10Tales' invention, existing systems for providing digital media content to users had drawbacks in "attract[ing] individuals to content that is personally more relevant and impactful for them." Appx50, 2:3-4. None of these conventional systems addressed how technology could be used to understand the individual's likes or dislikes or the individual's current mood to more appropriately adapt the content for the individual. Appx50, 2:7-11.

The system described in the '030 patent solves the drawbacks of those conventional systems. It modifies digital media content to personalize it based not only on information provided to the system by the user, but also through the social dynamics of the user as learned by the system, i.e., "user attributes" contained in the user's "user social network information." Appx51, 3:24-32, 4:15-23; Appx52, 5:11-30; Appx56, 13:4-6. By way of example, the system may identify attributes related to an individual's dynamics within an online community and the potential for content to be defined within that dimension. Appx53, 8:1-6. These and other attributes are correlated with attributes of the digital media assets to match the assets to an individual in order to provide the highest level of impact. Appx53, 7:56-59.

The improvements described and claimed in the '030 patent reflect changes to and technological improvements over the state of the art at the time. Appx101 at ¶¶59-60. The technological improvements and solutions described and claimed in the '030 patent were neither conventional nor generic at the time of the invention. Appx101 at ¶¶59-60. Instead, the invention set forth in the claims of the '030 patent involve novel and nonobvious approaches to the problems and shortcomings prevalent in the art at the time. Appx101 at ¶¶59-60.

For example, based on information about user's affinities, the system may cause the insertion or replacement of material being presented in the digital media content being delivered to the user to enhance the user's experience. *See, e.g.*, Appx54, 10:16-20. By creating a more impactful experience for the user by modifying the content, the system presents content that is less likely to be skipped over or fast-forwarded through by the user, as was a recognized problem with conventional systems at the time. *See, e.g.*, Appx51, 3:63-4:14.

The inventions claimed in the '030 patent involve and cover more than just the performance of well understood, routine, and/or conventional activities known to the industry prior to the invention of the methods, systems, and devices by the inventor of the '030 patent, Mr. Russek. Indeed, the '030 patent describes a system for "customizing and personalizing digital media content based on a combination of the user's demographics, psychodemographics, cognitive states, emotional states,

7

social placement and group interaction dynamics within an online community, and/or affinity for certain content elements (images, sounds, segments, graphics, video, text, dialog), self provided narrating content, internal narrative traits preference topology, and expectation level and temporal spacing of assets within the narrative." Appx50-51, 2:66-3:7.

The correlation of a user's attributes with attributes of the digital media assets is accomplished through rule-based techniques such as summing the number of matching attributes, identifying key attributes, or providing a true/false test for one or more assets. Appx53, 7:56-62. Relative weighting schemes may also be incorporated to give preference to or emphasize certain attributes. Appx53, 7:62-64.

The '030 patent describes a digital media asset personalization system—as depicted in Figure 5A below—that includes a server 590 that executes software algorithms that access user profile attributes 561 and online community user attributes 521 to determine digital media assets that will have a strong impact on that user. Appx29, Figure 5A; Appx55, 12:17-30; Appx57, 15:10-34. The '030 patent also describes the types of social network information that may be used to inform the algorithms used to determine which assets will have a strong impact on the user. Such social network information can include, *inter alia*, groups the user is affiliated with, a user's online personality or alter ego, how others perceive the user, the user's

involvement with other users in an online social network, and the user's relationships

with other users.  Appx56, 13:50-62.



Appx29, Figure 5A.

The '030 patent describes how the system identifies a digital media

presentation based on the available user profile information.  Separate from that

digital media presentation, the system determines if the presentation should be

**modified** to present other digital media assets that will result in the user feeling more

personally connected to the digital media presentation based on the system's

identification of digital media assets **based on the user's updated profile**

**information, including the user's social network user profile information**.  *See*,

*e.g.*, Appx54, 9:24-10:58; Appx58, 17:17-18:3.  Such personalization of the digital

9

media presentation may be based on collaboration with other users by, e.g., sharing digital media content with other users. Appx59, 19:58-66.

Claim 1 of the '030 patent is drawn to this new type of personalized digital media presentation system that **identifies and presents digital media content to a user, but then modifies the content being provided to the user after retrieving social network user profile information from an external source to further personalize the content**. Claim 1 is directed to such a system, and recites:

1. **A system** for associating user attributes with digital media asset attributes and creating a user specific composite digital media display, the system comprising:

a) a server;

b) a computer-readable storage medium operably connected;

c) wherein the computer-readable storage medium contains one or more programming instructions for performing a method of associating user attributes with digital media asset attributes and creating a user specific composite digital media display, the method comprising:

identifying a first set of digital media assets stored on the computer-readable storage medium,

creating, from the first set of digital media assets, a first composite digital media display,

presenting to the user via a display server, the first composite digital media display;

10

**retrieving user social network information from at least one source external to the presented first composite digital media display, wherein the user social network information contains one or more user attributes**;

**selecting, based on the user attributes in the social network information, a second set of digital media assets, wherein the second set of digital media assets is associated with one or more user attributes found in the user social network information**;

monitoring the first composite digital media display for the presence of a trigger, wherein the trigger indicates a personalization opportunity in the first set of digital media assets;

**performing a rule based substitution of one or more of the digital media assets from the first set of digital media assets with one or more of the digital media assets from the second set of digital media assets to create a user specific set of digital media assets**;

creating, from the user specific digital media assets, a user specific composite digital media display; and

presenting to the user via the display server, the second composite digital media display.

Appx59-60, claim 1.

## C.    The Prosecution of the '030 Patent

The PTO addressed the eligibility of the presented claims during prosecution of the '030 patent to its satisfaction.  The original method claims were rejected in the first Office Action under 35 U.S.C. § 101 as being directed to nonstatutory

subject matter. Appx474. In response, 10Tales amended the claims, and argued that amended claims 1-4 were directed to statutory subject matter, but the PTO maintained its rejection under § 101. Appx489.

In response to the Final Rejection, 10Tales cancelled the pending claims and presented two new system claims. Appx497-498. In its response, 10Tales also addressed the Srinivasan reference—U.S. Patent No. 6,357,042—that the PTO had asserted as an anticipatory reference in the Final Rejection. *See* Appx490. 10Tales explained that the system patented in Srinivasan "does not utilize social network information obtained from a source external to the presentation" as required by the claims presented by 10Tales. Appx494. In addition, 10Tales explained that its claims require "the creation of the second set of digital media assets through rule based substitution." Appx494. By doing so, 10Tales' claimed system "allow[s] parts of the media display (e.g. background, timing, audio) to be varied in a way that does not destroy the flow." Appx494. In contrast, conventional systems such as that patented in Srinivasan, simply permit "the selection of a particular analog video stream at a branch point." Appx494. In other words, 10Tales' claimed system is an improvement over conventional systems because it permits the modification of the content being presented to the user to further personalize that content based on the social network information retrieved from an external source.

In response, the PTO withdrew its § 101 rejection and issued a Notice of

Allowability, allowing the claims that issued as claims 1 and 2 in the '030 patent. Appx503-505. The examiner issued a statement recognizing the improvements that 10Tales' claims provide over prior art systems:

> 4. The following is an examiner's statement of reasons for allowance: the closest prior art, Srinivasan *et al.*, does not teach or suggest, **retrieving user social network information from at least one source external to the presented first composite digital media display, wherein the user social network information contains one or more user attributes**. Herz … teaches this limitation, but the prior art does not teach or suggest adding this teaching from Herz to the teachings of Srinivasan *et al.* Srinivasan *et al.* gets user attribute information by asking the users. The prior art does not teach or suggest that the benefits of going to social networks to get user attribute information would outweigh the costs.

Appx504 (emphasis in original, footnote omitted).[1]

## D.  TikTok's Denied Petition for *Inter Partes* Review of the '030 Patent

After 10Tales filed its original complaint in the Western District of Texas, on February 9, 2021, TikTok filed a petition for *inter partes* review of the '030 patent with the PTAB. Appx1223-1321. In its petition, TikTok argued that the claims of the '030 patent were unpatentable as obvious under three different grounds asserting technical patents directed to systems for presenting digital media. Appx1223-1321. The PTAB denied institution of TikTok's IPR. Appx508-529.

---

[1] All emphasis in this brief has been added unless otherwise specified.

Similar to the examiner's findings in allowing the '030 patent to issue, the PTAB concluded that TikTok failed to demonstrate that any of the systems described in its three proposed grounds "either alone or in combination, disclose '**retrieving user social network information from at least one source external to the presented first composite digital media display, wherein the user social network information contains one or more user attributes**,' element [1g] in claim 1." Appx513.

## E.    Claim Construction of the '030 Patent

On August 14, 2023, the district court entered its Order Construing Claim Terms of U.S. Patent No. 8,856,030. Appx2907-2931. In construing the claims, the district court adopted TikTok's expert's proposed standard for the level of ordinary skill in the art:

> at least a bachelor's degree, or an equivalent degree, in electrical engineering, computer science, or a related field, and **2-3 years' experience researching, designing, developing, and/or testing** *systems for digital media creation* **and related firmware and software**, or equivalent experience. Someone with less formal education but more experience or more formal education but less experience could also have qualified as a [person of ordinary skill in the art].

Appx2912.

14

TikTok argued that seven of ten disputed claim terms in claim 1 were indefinite. *See* Appx2910. The district court disagreed with TikTok with regard to each of these seven terms. One of the terms that TikTok argued was indefinite was the term "user social network information." Appx2923. TikTok claimed that the term was indefinite because the phrase "social network information" only appears in the claim language and not the specification. To support its position that the term was "indefinite," TikTok submitted a declaration of Dr. Alan Bovik in which Dr. Bovik opined that "given that **social networks were in there [sic] infancy or non-existent in the realm of digital media creation, one of ordinary skill in the art of digital media creation would not understand** what this term means, nor **how to derive user attributes from retrieved social network information**," Appx1472, and that "[g]iven the state of social networks at the time (April 7, 2003), and the lack of description in the specification, **the process for extracting a user attribute from a user's interaction with a networked community would not have been well known in the art** to a POSITA," Appx1477.

The district court did not consider Dr. Bovik's opinions to impact claim construction, and construed the term "user social network information" to mean "information derived from a user's interactions in an online community." Appx2927.

Similarly, TikTok argued that the limitation requiring that the claimed system

is capable of "performing a rule based substitution of one or more of the digital media assets from the first set of digital media assets with one or more of the digital media assets from the second set of digital media assets" was indefinite. Appx2930. To support this argument, TikTok again relied on its expert, Dr. Bovik, who opined that since "there is no description [in the specification] of how to manipulate digital media assets from one group to replace a digital media asset in another group," the term was indefinite. Appx1495. Dr. Bovik also opined that "performing a rule based substitution in real time as the system is presenting the default or first composite digital media display" is "likely to be a complex task." Appx1495.

The district court, after reviewing the specification and the intrinsic evidence, determined that a person of ordinary skill in the art would understand the term "rule-based substitution" to refer to "a substitution that happens by application of a rule, rather than on the basis of some discretionary or subjective determination." Appx2931. The district court then concluded that no construction was required for this claim term. Appx1495.

## F.    The District Court Grants TikTok's Rule 12 Motion

After the Court entered its claim construction order, TikTok filed a motion under Rule 12(c), arguing that claim 1 of the '030 patent claims ineligible subject matter under 35 U.S.C. § 101. Appx. 4. On April 2, 2024, the district court entered its Order Granting Defendants' Motion for Judgment on the Pleadings. Appx. 1-21.

Under *Alice* step one, the district court concluded that claim 1 of the '030 patent is directed to the abstract idea of "providing personalized digital media content to a user." Appx6-15. Under *Alice* step two, the district court concluded that the claim elements, both individually and as an ordered combination, do not contain an inventive concept. Appx15-19. In reaching its conclusion, the district court ruled that evidence of novelty and non-obviousness "is of no relevance" in analyzing whether there is any underlying factual disputes relating to eligibility. Appx14. In its order, the district court also denied 10Tales' request for leave to amend. Appx19-20.

## SUMMARY OF ARGUMENT

Under 35 U.S.C. § 101 "[w]hoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefor." On October 7, 2014, 10Tales obtained U.S. Patent No. 8,856,030 ("the '030 patent"), entitled "Method, System and Software for Associating Attributes Within Digital Media Presentations." Under 35 U.S.C. § 282, the '030 patent is presumed valid and patent-eligible.

Claim 1 of the '030 patent is directed to a system for presenting personalized digital media content to a user that requires, *inter alia*, providing a first stream of content to a user, then retrieving user social network information from an external source, using that user social network information to select personalized content for

the user, then modifying the first stream of content to provide a more personalized stream of content.  In allowing the '030 patent to issue, the examiner found that the systems described in the closest prior art do not teach or suggest retrieving user social network information from an external source.  That was an important inventive aspect of 10Tales' invention directed to improving conventional digital media presentation systems in 2003—when online social networks were in their very early stage.

The district court erred in its application of the *Alice/Mayo* framework in finding at the Rule 12 stage that claim 1 of the '030 patent is patent ineligible as being directed to an abstract idea.  The Supreme Court has explained that § 101 contains three narrow judicially-created exceptions to patentable subject matter: laws of nature, natural phenomena, and abstract ideas are not patentable.  *Alice Corp. Pty. Ltd. v. CLS Bank Int'l*, 573 U.S. 208, 216 (2014) (cleaned up).  The "concern that drives this exclusionary principle [is] one of pre-emption." *Id.*  Because these judicial exceptions are "the basic tools of scientific and technological work," the concern is to avoid "inhibit[ing] further discovery by improperly tying up the future use of these building blocks of human ingenuity." *Id.*  But because all inventions are based at least in part on these judicial exceptions, the Court has cautioned their application and stressed that the application of such concepts to a new and useful end remain eligible for patent protection. *Id.* at 217.

To ensure that this caution is exercised, the Court has endorsed the *Alice/Mayo* two-step framework for distinguishing patents directed to judicially-excepted subject matter from those that are patent-eligible. But pertinent here, it is well documented that courts across the country—including this Court—have struggled in particular with applying the *Alice/Mayo* framework to the "abstract idea" judicial exception.

At step one, the district court erred by failing to consider the language of claim 1 "as a whole," as is required. Under a proper step-one analysis, the language of claim 1 recites a system that particularly applies the concept of "presenting personalized content" to a new and useful end that makes use of user social network information retrieved from an external source to modify digital media content being presented to a user to present further-personalized content. The district court erred in finding instead that claim 1 was generally directed to simply "the abstract idea of providing personalized digital media content to a user." Appx15.

At step two, the district court erred by failing to recognize that, at a minimum, the record supports a plausible factual dispute as to whether claim 1 recites inventive concepts that provided improvements over existing technology for providing digital media content to a user. Claim 1 recites a technology-based solution to modify and customize digital media content to a particular individual that overcomes problems that existed with conventional systems.

The district court's error in finding claim 1 of the '030 patent ineligible for patent protection is evident if checked against the Supreme Court's driving concern behind the judicial exceptions to patent eligibility under § 101—preemption. Even if the district court were correct in finding that claim 1 is directed to the abstract idea of "providing personalized digital media content to a user," *Alice* step two confirms eligibility. The recited limitations of claim 1 requiring the retrieval of user social network information from an external source and substituting digital media assets selected based on that information into an original stream to enhance the content being provided to the user requires a specific way of doing so. Under a preemption analysis, the concern is whether the claimed invention "preempts all techniques" for carrying out the invention—here it does not. *See McRO, Inc. v. Bandai Namco Games America Inc.*, 837 F.3d 1299, 1315 (Fed. Cir. 2016).

Beyond the specifics of the district court's application of the *Alice/Mayo* framework, the district court erred by not resolving all factual disputes underlying its determination of the § 101 issue on TikTok's Rule 12 motion in 10Tales' favor. Specifically, the district court refused to consider whether the Rule 12 record supports a finding that certain claim elements in the claimed invention were nonobvious improvements over existing systems also supports an inference that these claim elements or combinations of elements were not well-understood, routine, and conventional. *See Berkheimer v. HP Inc.*, 881 F.3d 1360, 1368 (Fed. Cir. 2018)

("And the Supreme Court recognized that in making the § 101 determination, the inquiry "might sometimes overlap" with other fact-intensive inquiries like novelty under § 102." (quoting *Mayo Collaborative Servs. v. Prometheus Labs., Inc.*, 566 U.S. 66, 90 (2012)).  On this record, there are disputed factual issues including at least whether 10Tales' claimed system was well-understood, routine, and conventional at the time of the invention.  Thus, the district court should have found that there is at least a plausible factual dispute regarding the inventive concept, precluding a resolution of patent eligibility at the Rule 12 stage.

The district court's dismissal of 10Tales' complaint should be reversed, and this case should be remanded.

## **ARGUMENT**

### I.    **Standard of Review**

This Court reviews a district court's dismissal under regional circuit law, here the Ninth Circuit.  *Coop. Entm't, Inc. v. Kollective Tech., Inc.*, 50 F.4th 127, 130 (Fed. Cir. 2022) (citation omitted).  "The Ninth Circuit reviews de novo whether a complaint contains 'well-pleaded facts … that plausibly give rise to an entitlement to relief.'"  *Id.* (quoting *Whitaker v. Tesla Motors, Inc.*, 985 F.3d 1173, 1176 (9th Cir. 2021)).  The Court must "presume all factual allegations in the complaint to be true and draw all reasonable inferences in favor of the nonmoving party."  *Usher v. City of Los Angeles*, 828 F.2d 556, 561 (9th Cir. 1987).  In ruling on a motion to

dismiss, courts "consider only allegations contained in the pleadings, exhibits attached to the complaint, and matters properly subject to judicial notice." *Plaskett v. Wormuth*, 18 F.4th 1072, 1083 (9th Cir. 2021).

"[A] complaint may be dismissed when the allegations of the complaint give rise to an affirmative defense that clearly appears on the face of the pleading." *Boquist v. Courtney*, 32 F.4th 764, 774 (9th Cir. 2022). Dismissal is appropriate at the pleading stage, however, "[o]nly when the plaintiff pleads itself out of court" by "admit[ting] all the ingredients of an impenetrable defense." *Durnford v. MusclePharm Corp.*, 907 F.3d 595, 603 n.8 (9th Cir. 2018) (citation omitted).

A U.S. patent is presumed valid under 35 U.S.C. § 282, thus any invalidity conclusion must be proven by clear and convincing evidence. *See Microsoft Corp. v. i4i Ltd. P'ship*, 564 U.S. 91, 95 (2011). Patent eligibility under § 101 is ultimately a question of law, which may contain underlying factual issues. *Berkheimer v. HP Inc.*, 881 F.3d 1360, 1368 (Fed. Cir. 2018). A challenge to patent eligibility is an affirmative defense to a claim of patent infringement. *See, e.g.*, *Intellectual Ventures I LLC v. Erie Indem. Co.*, 850 F.3d 1315, 1324 (Fed. Cir. 2017) (describing challenge to a patent's validity under § 101 as an example of "an affirmative defense directed to the patent in question"). "[P]atent eligibility may be resolved at the Rule 12 stage only if there are no plausible factual disputes after drawing all reasonable inferences

from the intrinsic and Rule 12 record in favor of the non-movant." *Coop. Entm't, Inc.*, 50 F.4th at 130.

## II. Claim 1 of the '030 Patent Passes *Alice* Step One Because It Is Directed to Patent Eligible Subject Matter

The '030 patent is presumed eligible pursuant to 35 U.S.C. §§ 101 and 282(a). *Cellspin Soft, Inc. v. Fitbit, Inc.*, 927 F.3d 1306, 1319 (Fed. Cir. 2019) (rejecting district court's conclusion that patents were presumed valid but not presumed patent eligible) (citing *Berkheimer*, 881 F.3d at 1368 and *Microsoft*, 564 U.S. at 100).

"Patent eligibility under § 101 is a question of law that may contain underlying issues of fact." *CardioNet, LLC. v. InfoBionic, Inc.*, 955 F.3d 1358, 1367 (Fed. Cir. 2020) (citations omitted). For example, "[w]hether a claim recites patent eligible subject matter is a question of law which may contain disputes over underlying facts." *Berkheimer*, 881 F.3d at 1368. "Whether something is well-understood, routine, and conventional to a skilled artisan at the time of the patent **is a factual determination**. Whether a particular technology is well-understood, routine and conventional goes beyond what was simply known in the prior art." *Id.* at 1369. Any disputes over such underlying facts must be resolved in 10Tales' favor on a Rule 12 motion.

Congress intended patent eligibility under § 101 to "include anything under the sun that is made by man." *See Diamond v. Chakrabarty*, 447 U.S. 303, 309 (1980) (cleaned up). The three narrow exceptions to patentable subject matter are

claims that exclusively cover an abstract idea; a law of nature; or a natural phenomenon are not patentable. *Mayo Collaborative Servs. v. Prometheus Labs., Inc.*, 566 U.S. 66, 70 (2012). The Supreme Court has "described the concern that drives this exclusionary principle as one of pre-emption." *Alice*, 573 U.S. at 216. If a patent was granted on an abstract idea—which the Court has described as a "basic tool of scientific and technological work"—the concern would be that it would inhibit further discovery in a field by tying up the future use of the idea. *See id.*

The *Alice* step-one test is intended to determine whether the claim **as a whole** is "directed to" one of the judicial exceptions, such as an abstract idea. *Alice*, 573 U.S. at 218. But judges on this Court have recognized that "the contours of the abstract idea exception are not easily defined. For that reason, the abstract idea exception is almost impossible to apply consistently and coherently." *Smart Sys. Innovations, LLC v. Chi. Transit Auth.*, 873 F.3d 1364, 1377 (Fed. Cir. 2017) (Linn, J., dissenting-in-part and concurring-in-part). Indeed, as Chief Judge Moore stated: "[w]hat we have is worse than a circuit split—it is a court bitterly divided. As the nation's lone patent court, we are at a loss as to how to uniformly apply § 101." *Am. Axle & Mfg., Inc. v. Neapco Holdings LLC*, 977 F.3d 1379, 1382 (Fed. Cir. 2020) (Moore, J., concurring). In any event, this Court maintains that "[a] telltale sign of abstraction is when the claimed functions are mental processes that can be performed in the human mind or using a pencil and paper." *Trinity Info Media, LLC*

*v. Covalent, Inc.*, 72 F.4th 1355, 1361-62 (Fed. Cir. 2023) (cleaned up).  Claim 1 of the '030 patent is directed to a system that carries out functions that are neither mental processes nor performable in the human mind or using a pencil and paper.  Claim 1 is not directed to an abstract idea, and the district court's decision granting TikTok's Rule 12 motion should be reversed.  At the very least, there are disputed underlying factual issues that preclude dismissal.

### A.    The District Court Erred in Its *Alice* Step-One Analysis by Failing to Consider the Claim as a Whole in the Context of the '030 Patent Specification

In determining whether a claim is directed to an abstract idea, the court is required to do more than "simply ask whether the claims *involve* a patent ineligible concept."  *Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327, 1335 (Fed. Cir. 2016) (emphasis in original).  This is so because "all inventions at some level embody, use, reflect, rest upon, or apply laws of nature, natural phenomena, or abstract ideas."  *Mayo*, 566 U.S. at 71.  The court must instead consider the claims in light of the specification to determine whether their "character as a whole is directed to excluded subject matter."  *Enfish*, 822 F.3d at 1335.  But courts "must tread carefully in construing this exclusionary principle lest it swallow all of patent law."  *Alice*, 573 U.S. at 217 (citation omitted).

The record here makes clear that claim 1 of the '030 patent is not directed simply to "an idea of itself."  *See Alice*, 573 U.S. at 218 (cleaned up).  Claim 1 of

the '030 patent recites an improved system for streaming digital content to a user in which the system modifies the content to personalize it based on information about the user that the system retrieves from an external source—"user social network information … contain[ing] … user attributes." Appx59-60, claim 1. Claim 1 recites an improved system for providing digital content to a user that cannot be said to exhibit the telltale sign of abstraction as would a mental process such as targeted advertising that can be carried out in the human mind. *See Trinity Info Media, LLC v. Covalent, Inc.*, 72 F.4th 1355, 1361-62 (Fed. Cir. 2023). By its very language, claim 1 is not directed to "an idea of itself," and the step-one inquiry should end.

But TikTok twice urged the district court to skim the language of claim 1 to find that it is "directed to" simply an abstract idea. In its first Rule 12 motion, TikTok argued that claim 1 is a "'quintessential' do it on a computer patent, that is simply directed to an abstract idea of customizing digital media on a generic computer/server technology." *See* Appx652 (cleaned up). In deciding that motion, the district court suggested that claim 1 "discloses the idea of targeted advertising," but denied TikTok's motion, finding that "claim construction can help clarify the basic character of the claimed invention . . . ." Appx651-652.

After claim construction, TikTok jettisoned its "do it on a computer" characterization of claim 1 and tried a new argument in its second Rule 12 motion. This time, seizing on the district court's "targeted advertising" comment in the denial

of TikTok's first motion, TikTok urged the court to find that claim 1 "is directed to the abstract idea of targeted advertising." Appx7. But the court disagreed. In undertaking its step-one analysis, the district court reviewed the language of claim 1—as well as the '030 patent specification—and found instead that while the patent discusses problems with conventional targeted advertising systems, "claim 1 of the '030 patent is **broader**; it recites a system and software for 'performing a method of associating user attributes' from 'user social network information' with 'digital media assets,' and then creating and presenting a personalized 'composite digital media display' to the user." Appx7 (citing the language of claim 1). The district court went on to state that it "agrees with 10Tales that **claim 1 is not limited to advertising**, and that the claim is **more generally directed to a system** for presenting personalized digital media content to a user **based on the user attributes from user social network information**." Appx7. This is not an abstract idea. The user attributes from user social network information are retrieved by the claimed system from an external source. As this court has observed, "[a] telltale sign of abstraction is when the claimed functions are mental processes that can be performed in the human mind or using a pencil and paper." *Trinity Info Media*, 72 F.4th at 1361-62. Claim 1 of the '030 patent exhibits no such telltale sign of abstraction. Moreover, the district court's summation of claim 1 ignores the fact that beyond just presenting personalized digital media content, claim 1 further requires that the

27

system modify the digital media content being provided to the user by substituting content that is being presented to a user with content that was selected based on the retrieved user social network information. Claim 1 is directed to a system that provides an improvement over conventional systems for providing digital media content to a user.

The district court's *Alice* step-one inquiry into what claim 1 as a whole is "directed to" exposes the error in its ultimate conclusion with respect to step-one, and compels reversal of its eligibility determination. When the district court observed that claim 1 is "broader" than being directed to simply the abstract idea of "targeted advertising," it was not discussing claim breadth. Instead, it was observing that the claimed invention is more specific than merely targeted advertising. Rather, as the district court recognized—claim 1 is directed to a specific system that retrieves user social network information from an external source and uses that information to modify the content to present more personalized digital media content to a user. As to claim breadth, the district court was observing that claim 1 is actually narrower than a claim directed simply to the abstract idea of targeted advertising—it requires more than that. The court's recognition that claim 1 is narrowly directed to a specific system and software for presenting content specifically based, *inter alia*, on user social network information that was retrieved from an external source is significant to the *Alice* step-one inquiry—indeed, it is dispositive. The court's findings confirm

28

that claim 1 of the '030 patent is not directed simply to the abstract idea of "targeted advertising," and it does not, therefore, inhibit—i.e. preempt—further discovery concerning targeted advertising itself by tying up its future use, as is the stated concern with the "abstract idea" judicial exception to patent eligibility.  *See Alice*, 573 U.S. at 216.  This is so because—as the court found—claim 1 recites specific requirements well beyond those that might be considered to simply involve the idea of targeted advertising.

But after finding that claim 1 is "**not** limited to advertising," the district court committed a cardinal sin in its step-one analysis:  it departed from the language of claim 1 as a whole that it had just analyzed, and generalized the claim as being directed simply to the abstract idea of "presenting personalized content to a user based on information about the user."  Appx7.  It went on to further generalize the claim in concluding that it is directed merely to "the abstract idea of providing personalized digital media content to a user."  Appx15.  In doing so, the court backtracked from its proper consideration of the language of claim 1 **as a whole** in light of the written description as *Alice* step one requires.  Claim 1 is actually directed to a system that modifies digital media content to make it more impactful for a particular user, and then presents that modified digital media content to the user.  The district court erred by generalizing claim 1, which is "inconsistent with [this Court's] instruction that courts be careful to avoid oversimplifying the claims

29

by looking at them generally and failing to account for specific requirements of the claims." *CardioNet*, 955 F.3d at 1371 (cleaned up) (quoting *McRO*, 837 F.3d at 1313).

The district court erred in its ultimate determination of what claim 1 is "directed to" for at least three reasons. First, contrary to Supreme Court guidance, the district court failed to "tread carefully" in its step-one analysis. *See Alice*, 573 U.S. at 217. One aspect of claim 1 may very well **involve** "presenting personalized content to a user based on information about the user." But "an invention is not rendered ineligible for patent simply because it involves an abstract concept." *Id.* The district court itself found that claim 1 as a whole—when considered in light of the specification requires something more—"it recites a system and software for 'performing a method of associating user attributes' from 'user social network information' with 'digital media assets,' and then creating and presenting a personalized 'composite digital media display' to the user." Appx7 (citing the language of claim 1). These are specific requirements of the claims. *See CardioNet*, 955 F.3d at 1371. Under a proper step-one analysis, claim 1 is "directed to" a system that particularly applies the concept of "presenting personalized content" to a new and useful end that makes use of user social network information retrieved from an external source to modify digital media content being presented to a user to present further-personalized content. It does so by performing a rule based substitution of

30

digital media assets from a first set with one or more digital media assets from a second set to modify the content being presented to the user. As required by the language of claim 1, therefore, the claimed system constitutes an improvement to existing digital media streaming technology as opposed to an abstract idea of itself. All of these requirements recited within the claim must be accounted for. *Id.* And once considered, claim 1 is not directed to merely an abstract idea.

Second, to find that claim 1 was directed to an abstract idea, the district court generalized the claim by excising the recited improvement to the technology from the claim language. But this Court has stated that that "inventions with specific applications or improvements to technologies in the marketplace are not likely to be so abstract that they override the statutory language and framework of the Patent Act." *BASCOM Global Internet Svcs., Inc. v. AT&T Mobility LLC*, 827 F.3d 1341, 1350 (Fed. Cir. 2016) (quoting *Research Corp. Techs. v. Microsoft Corp.*, 627 F.3d 859, 868 (Fed. Cir. 2010)). Neither TikTok nor the district court has been able to succinctly put its finger on the abstract nature of claim 1—because claim 1 requires significantly more than any abstract idea. Indeed, the district court declined to find that claim 1 was directed to the abstract idea of targeted advertising as urged by TikTok. And the court itself struggled with identifying what claim 1 as whole is directed to. It simply cannot be said that claim 1 **as a whole**—when viewed in the context of the '030 patent specification—is so abstract as to be ineligible.

Third, that claim 1 is directed to an improvement to digital streaming technology is evidenced by the district court's finding that "[a]s described in the specification, the '030 patent purports to address a need to learn more about a user in order to provide a user with digital media content that is more personally relevant and impactful." Appx7 (citing Appx50, 2:3-4, 2:8-11, 2:55-56). The district court erred by disregarding this description of the advantages of the claimed invention described in the '030 patent specification. *See CardioNet*, 955 F.3d at 1371. On a motion to dismiss under Rule 12(c), "the district court must construe all facts and draw all reasonable inferences in favor of [10Tales], the non-moving party." *Id.* On this record, there is no evidence to undermine the statements in the '030 patent concerning the benefits of the claimed system. *Id.* The district court's finding that claim 1 is limited to an abstract idea "is contrary to fact and fails to draw all reasonable inferences in [10Tales'] favor." *Id*.

For each of these independently sufficient reasons, the district court's Order dismissing this case should be reversed.

The district court further erred in analogizing claim 1 of the '030 patent to other claims that have been found to be ineligible by this Court and others. *See* Appx12-14. To make its comparisons, the district court improperly generalized claim 1 as being "directed to the abstract idea of providing personalized digital media content to a user." Appx15. Again, as reiterated in *CardioNet*, generalizing

the asserted claims—as the district court did here—is inconsistent with this Court's instruction to be careful to avoid oversimplifying the claims by looking at them generally and failing to account for specific requirements of the claims. *See CardioNet*, 955 F.3d at 1371. Claim 1 does not merely recite a system for providing personalized content to a user. Under *Alice* step-one, the determination of whether a claim is "directed to" an abstract idea requires that the claim be considered **in its entirety** and "in light of the specification" to determine whether its "character **as a whole** is directed to excluded subject matter." *Enfish*, 822 F.3d at 1335. As the district court itself found, claim 1 is not directed broadly to the abstract idea of targeted advertising.

None of the comparative cases cited by the district court concerned claims that were directed to a system that actually modifies digital media content based on content selected by the system based on externally retrieved user social network information to present personalized content to a user. The patents in the cases cited were directed to generally selecting specific content or transmitting targeted advertisements. Claim 1 of the '030 patent—on the other hand—is directed to a specific system that actually customizes content for a user during streaming.

In any event, this Court has found that "[w]hile prior cases can be helpful in analyzing eligibility, whether particular claim limitations are abstract or, as an ordered combination, involve an inventive concept that transforms the claim into

patent eligible subject matter, must be decided on a **case-by-case basis in light of the particular claim limitations, patent specification, and invention at issue**." *CosmoKey Sols. GmbH & Co. KG v. Duo Sec. LLC*, 15 F.4th 1091, 1099 (Fed. Cir. 2021). Here, claim 1 of the '030 patent recites specific limitations that require the retrieval of user social network information from an external source and substituting digital media assets selected based on that information into an original stream to enhance the content being provided to the user, which are not abstract.

The district court erred by characterizing claim 1 "at such a high level of abstraction and untethered from the language of the claims," that it has "all but ensure[d] that the exceptions to § 101 swallow the rule." *See Enfish*, 822 F.3d at 1337 (cleaned up). As a result, the district court rendered a foregone conclusion its comparison to a wide range of claims directed broadly to targeted content delivery, including, e.g., *Free Stream Media Corp. v. Alphonso Inc.*, 996 F.3d 1355 (Fed. Cir. 2021) (targeted advertising), *Chewy, Inc. v. Int'l Bus. Machines Corp.*, 94 F.4th 1354 (Fed. Cir. 2024) (targeted advertising), *Trinity Info Media, LLC v. Covalent, Inc.*, 72 F.4th 1355 (Fed. Cir. 2023) (matching based on questioning), and *Affinity Labs of Texas, LLC v. Amazon.com Inc.*, 838 F.3d 1266 (Fed. Cir. 2016) (delivering user-selected media content).

### B. Claim 1 Is Directed to a Specific Improved System and Not to an Abstract Idea That Would Preempt Further Discovery

To bring the *Alice* step-one analysis full-circle, as discussed *supra*, the concern that drives the judicial exceptions to patentability is one of preemption. *Alice*, 573 U.S. at 217. Accordingly, the *Alice* inquiry is intended to ensure that a patent does not simply claim a building block of ingenuity, e.g., an abstract idea, but rather, integrates the building block into something more, which will not tie up the underlying idea and transform the claim into a patent-eligible idea. *Id.* The preemption concern has been addressed by the courts in the context of both steps of an *Alice* inquiry, i.e., to confirm that the claim is not "directed to" a judicial exception such as an abstract idea (step-one), and if it is, to confirm that the claim recites "additional features" such that it does not preempt the abstract idea itself (step-two).

The underlying facts here demonstrate that claim 1 does not preempt the district court's oversimplified abstract idea of "providing personalized digital media content to a user." Nor does it preempt any of the abstract ideas to which the district court's comparative cases are directed. For example, in allowing claim 1 to issue, the examiner found that the system described in the prior art Srinivasan system would not be preempted because Srinivasan "does not teach or suggest, **retrieving user social network information from at least one source external to the presented first composite digital media display, wherein the user social network**

35

**information contains one or more user attributes**," as required by claim 1 of the '030 patent.  Appx504 (emphasis in original).  Similarly, in denying TikTok's IPR petition, the PTAB found that none of the prior art systems described in the closest prior art references identified by TikTok "either alone or in combination, disclose 'retrieving user social network information from at least one source external to the presented first composite digital media display, wherein the user social network information contains one or more user attributes,' element [1g] in claim 1." Appx513.

Both the examiner and the PTAB recognized that claim 1 specifically requires the system to retrieve social network information from an external source.  And TikTok's expert, Dr. Bovik, testified that at the time of the '030 patent, "social networks were in there [sic] infancy or non-existent in the realm of digital media creation."  Appx1472.  While novelty does not equate to eligibility, given that claim 1 is specifically directed to an improved system that retrieves user social network information and modifies digital media content based on that information, it cannot be said that claim 1 would preempt the entire field of "providing personalized digital media content to a user," which indisputably predated the '030 patent.

The record is clear that claim 1 as a whole does not preempt every application of the ideas of targeting advertising, providing personalized digital media content to

a user, or any other abstract idea. Claim 1 is directed to a system providing specific capabilities and recites a specific way to improve a user's digital media content by, *inter alia*, retrieving user social network information containing user attributes from a source external to digital media display. As a result, claim 1 recites additional features that ensure that it is more than a drafting effort designed to monopolize an abstract idea. *See DDR Holdings, LLC v. Hotels.com, L.P.*, 773 F.3d 1245, 1259 (Fed. Cir. 2014).

### C.    Claim 1 Is Directed To A Patent Eligible Improvement To Prior Art Systems For Presenting Digital Media Content

As the district court recognized, claim 1 of the '030 patent is "directed to a specific system for creating a more personalized set of digital media assets for a user based on retrieved user social network information." Appx7. "In cases involving software innovations, [the *Alice* step-one] inquiry often turns on whether the claims focus on 'the specific asserted improvement in computer capabilities … or, instead, on a process that qualifies as an 'abstract idea' for which computers are invoked merely as a tool.'" *Finjan, Inc. v. Blue Coat Sys., Inc.*, 879 F.3d 1299, 1303 (Fed. Cir. 2018) (citing *Enfish*, 822 F.3d at 1335-36).

As discussed *supra*, this Court has found that by itself, targeted advertising is well-known and constitutes an abstract idea. *See, e.g.*, *Free Stream Media*, 996 F.3d 1365 (claims reciting a system using a "relevancy matching server" to deliver targeted data based on "content identification data" and a "relevancy factor" are

"directed to the abstract idea of 'targeted advertising.'").  But the claimed system here does much more.

Claim 1 of the '030 patent is directed to a system that modifies digital media content to make it more impactful for the user by selecting content based on social network information about the user that the system itself retrieves from an external source, and then presents the user with the modified stream.  The system is distinguished from traditional digital media streaming systems that are limited to targeting content to a user based on information provided to the system by the user itself, e.g., a user's demographic information that might be included in a user's profile.  In addition, while conventional systems could select existing content for presentation, 10Tales' inventive system is further distinguished over these systems because it can modify the existing content to make it more impactful.  The question in an *Alice* step-one context, then, is whether this system for modifying a stream of content provided to a user based on social network information about the user that has been retrieved by the system from an external source constitutes an improvement in computer functionality.  *See Finjan*, 879 F.3d 1304.  Clearly the claimed system can only work on a computer—the computer is not simply a tool for carrying out a mental process that can be performed in the human mind or using a pencil and paper.  *See Trinity Info Media*, 72 F.4th at 1361-62.  The Court should therefore find that the system recited in claim 1 is an improvement in computer functionality.  *See*

*Finjan*, 879 F.3d 1304.

The claimed system for providing content to a user that is enhanced by "user social network information" retrieved from an external source by the system itself was invented by David Russek, and disclosed in the '030 patent specification. In contrast to conventional "targeted advertising" systems, which simply provide existing content to a user based on information known about the user, the system recited in claim 1 modifies the content being provided to the user based on information not specifically provided to the system by the user. Because the modified content being provided to the user has the benefit of being further tailored to that user based on user social network information that the system retrieved from an external source, the content will be more personally relevant and impactful to that particular user. Indeed, TikTok's own expert, Dr. Bovik, testified that at the time of the '030 patent, "social networks were in there [sic] infancy or non-existent in the realm of digital media creation." Appx1472. It was Mr. Russek that recognized that systems for presenting digital media could be improved to provide more impactful content for a user by retrieving user social network information from an external source and using that information to modify and improve the content being provided. In allowing the '030 patent to issue, the examiner agreed. Appx504.

In 2003, social networks were in their nascent stage, and it was Mr. Russek— who has a background in psychology—who determined that information about how

a user interacts within an online community could be used to determine, e.g., a user's affinities beyond information that a user may provide to a system as profile information. Tapping into that information enables a system to further personalize content for a user so that it will be more impactful. While claim 1 is not limited to advertising, the '030 patent specification describes one of the benefits of the improved system in that context: "the user is presented with an enhanced experience … that creates a greater emotional experience for the user and a more impactful narrative. This creates a more receptive state for product placed advertising, inserted into the content, for a direct advertisement, or for entertainment containing an advertising method." Appx51, 3:63-4:3.

Improving a computer system's ability to identify content for a particular user based on retrieving user social network information about that user can be a non-abstract computer-functionality improvement if done by a specific technique that departs from earlier approaches to solve a specific computer problem. *See Ancora Techs., Inc. v. HTC America, Inc.*, 908 F.3d 1343, 1348 (Fed. Cir. 2018) (citing *Finjan*, 879 F.3d at 1304-05). The system recited in claim 1 specifically identifies how that improvement is effectuated in an unconventional way: first, the system identifies and presents a first set of digital media content to a user; then the system retrieves user social network information from an external source that includes user attributes; then, based on the retrieved user social network information, the system

selects further personalized content and modifies the first set of digital media content through a rule based substitution of the first set of content with the personalized content such that the user is provided with content that is tailored to that user based on information the system retrieved about the user.  Appx59-60, claim 1.  The improved system relies on a specific and unique approach to enhancing content being targeted to a user that was not previously envisioned, and the result is a system that presents highly-impactful content to a user.

The prosecution history reinforces the improvement in the claimed system over conventional streaming systems.  In allowing the '030 patent to issue, the examiner found that the closest prior art systems "[do] not teach or suggest, **retrieving user social network information from at least one source external to the presented first composite digital media display, wherein the user social network information contains one or more user attributes**."  Appx504 (emphasis in original).[2]  Not only does the prosecution history highlight the claimed improvement, it specifically identifies the "retrieving" step, which retrieves social network information from an external source as a distinguishing feature of the claimed system.  It goes without saying, then conventional systems did not have the capability to modify digital media content for a user to further personalize the

---

[2] In deciding the Rule 12 motion, the district court took judicial notice of records from the '030 patent prosecution history and IPR proceedings.  *See* Appx14, n.2; Appx471-529.

content based on the retrieved user social network information. Claim 1 is therefore narrowly tailored to require much more than the abstract idea of "targeted advertising" of itself. This alleviates the preemption concern that drives the exclusion of "abstract ideas" from the broad contours of patentable subject matter under § 101. *See Alice*, 573 U.S. at 216.

Claim 1 of the '030 patent "therefore passes muster under *Alice* step one, as it is not directed to patent-ineligible subject matter," and there is no need to apply step two of the *Alice* analysis. *See Ancora*, 908 F.3d at 1349 (citations omitted).

### III. Claim 1 of the '030 Patent Passes *Alice* Step Two Because It Includes an Inventive Concept That Is a Technical Improvement Over Existing Technological Processes

Even if claim 1 of the '030 patent were directed to the abstract idea of "presenting personalized content to a user based on information about the user," as the district court found, or "targeted advertising" as TikTok argued in its Rule 12 motion, claim 1 is still directed to patent-eligible subject matter because it includes "additional features" that ensure that it "is more than a drafting effort designed to monopolize the [abstract idea]." *Alice*, 573 U.S. at 221 (quoting *Mayo*, 566 U.S. at 77). Instead, claim 1 should be read to "improve[] an existing technological process." *BASCOM*, 827 F.3d at 1351 (quoting *Alice*, 573 U.S. at 223); *see also In re Killian*, 45 F.4th 1373, 1382 (Fed. Cir. 2022) ("We have explained that claims for methods that 'improve[] an existing technological process' include an inventive

concept at step two.") (quoting *BASCOM*, *Alice*).

Claim 1 includes the limitation that the claimed system must "retriev[e] **user social network information** from at least one **source external to the presented first composite digital media display**," and that "user attributes in the [retrieved] social network information" must be used by the claimed system to select "a second set of digital media assets." A non-infringing system—such as the prior art systems cited by the examiner and the prior art systems identified by TikTok in its IPR petition—could implement the abstract ideas of "presenting personalized content to a user based on information about the user" and "targeted advertising" without retrieving user social network information from at least one source external to the presented first composite digital media display. It cannot be said, therefore, that claim 1 is a drafting effort designed to monopolize either of these ideas.

Indeed, at the time of the '030 patent invention—as confirmed by the examiner during prosecution—systems described in the closest prior art had not envisioned resort to user social network information to improve the content of digital media content to make it more impactful for a particular user. That was Mr. Russek's invention, as described in the '030 patent. And the record shows that claim 1 of the '030 patent would not monopolize the field because "[t]hat which if infringes, if later, would anticipate, if earlier." *See Peters v. Active Mfg. Co.*, 129 U.S. 530, 537 (1889). The examiner found that the prior art systems directed to "presenting

personalized content to a user based on information about the user" and "targeted advertising" do not anticipate claim 1. *See* Appx504. On a Rule 12 motion, the examiner's finding that claim 1 does not preempt either of these abstract ideas at the very least supports an inference that it is directed to patent-eligible subject matter because it includes "additional features" that ensure claim 1 "is more than a drafting effort designed to monopolize the [abstract idea]." *Alice*, 573 U.S. at 221 (quoting *Mayo*, 566 U.S. at 77).

Although the Supreme Court used the term "inventive concept" to describe what it is that helps the patentee survive *Alice* step two, the "inventive concept" itself is simply a search for an "an element or combination of elements that is 'sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the [ineligible concept] itself.'" *Id.* at 217-18 (quoting *Mayo*, 566 U.S. at 73). "[T]he inventive concept inquiry requires more than recognizing that each claim element, by itself, was known in the art." *BASCOM*, 827 F.3d at 1350. Instead, "an inventive concept can be found in the non-conventional and non-generic arrangement of known, conventional pieces." *Id.*

The '030 patent describes the inventive concept set forth at least in the ordered combination of claim elements recited in claim 1. The '030 patent identifies drawbacks with conventional systems for providing composite digital media displays, including, for example, the difficulty such systems had in "attract[ing]

individuals to content that is personally more relevant and impactful for them." The '030 patent describes and claims an unconventional system that personalizes the digital media content **based on information retrieved by the system from sources external to the digital media**, i.e., "user social network information."

The prosecution history of the '030 patent confirms this evidence of an inventive concept. During prosecution, the examiner allowed the claims finding that "the closest prior art … does not teach or suggest, **retrieving user social network information from at least one source external to the presented first composite digital media display, wherein the user social network information contains one or more user attributes**." Appx504 (emphasis in original, footnote omitted).

The examiner found an obscure reference that described retrieving user social network information applying the broadest reasonable interpretation standard, but concluded that there was no teaching or suggesting of combining the step of "**retrieving user social network information from at least one source external to the presented first composite digital media display, wherein the user social network information contains one or more user attributes**" with the other limitations found in claim 1. *See* Appx504-505. At the time of the '030 patent, the conventional means through which systems retrieved information about a user was by directly asking the users for such information—such as by asking the user to state his or her interests and preferences, or by asking the user for biographical

45

information.  *See* Appx504.

The examiner further noted that "surely, observing a user in a social network would yield more information than simply asking the user for his or her characteristics and preferences," but that a person of ordinary skill in the art would not know whether the benefits of obtaining this information from this unconventional source would outweigh the costs.  *See* Appx504.

Drawing all reasonable inferences in favor of eligibility, as is required on a Rule 12 motion, the district court should have concluded—and this Court should conclude on review—that either the step of retrieving social network information from at least one source external to the first presented composite digital media display was by itself an inventive concept, or at the very least that the inventive concept here is found in the non-conventional and non-generic arrangement of known, conventional pieces.

Instead, however, the district court erred by inferring that the "retrieving social network information" step was a conventional step, and then merely concluded without explanation that "[t]here is also nothing inventive about the ordered combination of these elements."  Appx19.  Given the statements of the examiner during prosecution, however, the Court should have inferred at the pleading phase that there was in fact something inventive about the ordered combination of elements here.

Moreover, to support its claim construction argument, TikTok submitted a declaration of Dr. Alan Bovik in which Dr. Bovik opined that "given that **social networks were in there [sic] infancy or non-existent in the realm of digital media creation, one of ordinary skill in the art of digital media creation would not understand** what this term means, nor **how to derive user attributes from retrieved social network information**," Appx1472 (emphasis added), and that "[g]iven the state of social networks at the time (April 7, 2003), and the lack of description in the specification, **the process for extracting a user attribute from a user's interaction with a networked community would not have been well known in the art** to a POSITA," Appx1477 (emphasis added). In other words, Dr. Bovik—TikTok's own expert—opined that the process of extracting a user attribute from user social network information was neither a conventional nor routine means of obtaining user attributes in the context of a system for generating digital media content. At the very least, Dr. Bovik's declaration supports an inference that extracting user attributes from social network information was at a minimum, a non-conventional and non-generic arrangement when used in a system for generating and presenting digital media content. Taking all inferences in favor of 10Tales—as is required on a Rule 12 motion—the ordered combination of claim elements recited in claim 1 of the '030 patent includes an inventive concept. *See BASCOM*, 827 F.3d at 1350.

The PTAB also found that claim 1 was directed to an improvement over conventional systems in denying TikTok's IPR petition. There the Board found that—even under a lower preponderance of the evidence standard—TikTok failed to demonstrate that the asserted prior art "either alone or in combination, disclose '**retrieving user social network information from at least one source external to the presented first composite digital media display, wherein the user social network information contains one or more user attributes**,' element [1g] in claim 1." Appx513. Stated differently, the PTAB found that claim 1 is directed to a specific application that is an improvement over the prior art, and as such, cannot be so abstract as to override the broad statutory language of § 101. *See BASCOM*, 827 F.3d at 1350 (quoting *Research Corp. Techs.*, 627 F.3d at 868).

Given (i) the statements of the examiner allowing claim 1 of the '030 patent to issue; (ii) TikTok's own expert's opinion; (iii) the PTAB's findings that TikTok was unable to show how its best prior art either alone or in combination disclosed the ordered combination found in claim 1 of the '030 patent; (iv) the presumption of validity of the '030 patent; and (v) the requirement that the district court make all inferences in favor of 10Tales on TikTok's Rule 12 motion, the district court should have found—or at least inferred—that, at a minimum, the ordered combination of the limitations in claim 1 contains an inventive concept, which is more than merely an implementation of the "abstract idea" of "presenting personalized content to a

48

user based on information about the user." *See Coop. Entm't, Inc.*, 50 F.4th at 130 ("Thus, patent eligibility may be resolved at the Rule 12 stage only if there are no plausible factual disputes after drawing all reasonable inferences from the intrinsic and Rule 12 record in favor of the non-movant.").

The district court, however, declined to draw such reasonable inferences in favor of 10Tales based on an incorrect assumption that because the examiner, TikTok's expert, and the PTAB were evaluating the question of whether the claimed improvements to existing technological systems would have been obvious at the time of the invention was made, their observations were irrelevant to the eligibility inquiry under § 101. *See* Appx14-15 (district court concluding that "the novelty of any element or steps in a process, or even the process itself, is of no relevance in determining whether the subject matter of a claim falls within the § 101 categories of possibly patentable subject matter." (quoting *Diamond v. Diehr*, 450 U.S. 175, 188-89 (1981)) (further citations omitted) (cleaned up). This is incorrect. While a novel and nonobvious claim may still be ineligible under § 101, the question of fact as to whether a claim element or combination of elements is well-understood, routine, and conventional to a skilled artisan in the relevant field may overlap with the underlying factual issues relating to novelty and nonobviousness. *See Berkheimer*, 881 F.3d at 1368 ("And the Supreme Court recognized that in making the § 101 determination, the inquiry "might sometimes overlap" with other fact-

intensive inquiries like novelty under § 102." (quoting *Mayo*, 566 U.S. at 90)).  Thus, the district court erred in excluding the portions of the record that plausibly indicate a dispute on the underlying factual question of whether a claim element or combination of elements was well-understood, routine and conventional to a skilled artisan in the relevant field at the time of the invention.

Moreover, the recited step of "retrieving user social network information from at least one source external to the first presented composite digital media display" is not the only limitation that makes the arrangement of the specific limitations in claim 1 of the '030 patent an inventive concept.  Rather, the limitation requiring the claimed system be capable of "performing a rule based substitution of one or more of the digital media assets from the first set of digital media assets with one or more of the digital media assets from the second set of digital media assets to create a user specific set of digital media assets" (the "rule-based substitution" step) also makes the specific combination of limitations inventive.

As explained in the '030 patent specification, prior art systems did not allow for parts of the digital media content (e.g. backgrounds, overlap graphics, icons, text, sound, and/or product placement images) to be modified as the digital media content is being presented to a user.  *See, e.g.*, Appx51, 3:12-17.  The specification explains that one new and useful purpose for the claimed system is that it would allow advertisers to modify a specific product placement image—as well as other aspects

of the media such as the background, music, etc.—that would be included in the user specific media presented to a user. This is different from prior art systems that would merely select entire pre-created advertisements that could be presented to the user while the unmodified original content was streamed.

The claimed invention overcame this limitation in prior art systems by incorporating a limitation that while the original media content is being displayed, the system is capable of performing a rule based substitution that could substitute a digital media asset—including background or product placement images—with digital media assets that would make the modified media content more impactful to the user. The specification discloses how the media content can be created to allow for the system to perform the claimed rule based substitution. *See, e.g.*, Appx54-55, 9:24-11:2; Appx27, Fig. 3; Appx59, 19:31-47.

During prosecution, the examiner had determined that the closest prior art was U.S. Patent No. 6,357,042 (Srinivasan). In responding to the examiner's rejection based on Srinivasan, 10Tales explained that its claims require "the creation of the second set of digital media assets through rule based substitution." Appx494. 10Tales further explained that this rule based substitution "allow[s] parts of the media display (e.g. background, timing, audio) to be varied in a way that does not destroy the flow." Appx494. In contrast, conventional systems such as that patented in Srinivasan, simply permit "the selection of a particular analog video stream at a

branch point." Appx494. In other words, 10Tales' claimed system is an improvement over the system disclosed in the closest prior art because the claimed system permits the modification of parts of the media being displayed by creating a modified video stream through rule based substitution. This is an improvement in computer technology and not just an improvement that does something on a machine.

Drawing all reasonable inferences in favor of eligibility—as required on a Rule 12 motion—the district court should have concluded either that the rule based substitution step was by itself an inventive concept, or at the very least that the inventive concept here is found in the non-conventional and non-generic arrangement of known, conventional pieces.

Instead, however, the district court erred by inferring that the rule based substitution step was a conventional step, and then merely concluded without explanation that "[t]here is also nothing inventive about the ordered combination of these elements." Appx19. Once again, however, the district court failed to consider that the underlying factual issue as to whether the claimed improvements to existing technological processes for presenting personalized digital media content to a user at issue here were well-understood, routine, and conventional to a skilled artisan overlaps with the underlying factual issues as to whether these improvements were nonobvious. *See Mayo*, 566 U.S. at 90; *Berkheimer*, 881 F.3d at 1368.

Given the explanation in the '030 patent specification that prior art systems were not capable of substituting parts of the media content—such as a product placement image—while the media content was being presented to a user, and given the prosecution history showing that the closest prior art lacked the capability to create a modified digital media stream through rule based substitution, the district court should have inferred on TikTok's Rule 12 motion that the ordered combination of elements here includes an inventive concept.

Moreover, to support its claim construction argument, TikTok submitted a declaration of Dr. Alan Bovik in which Dr. Bovik opined "performing a rule based substitution in real time as the system is presenting the default or first composite digital media display" is "likely to be a complex task."  Appx1495.  Dr. Bovik also opined that a person of ordinary skill in the art would not know how to perform this complex task.  Appx1495.

Once again, TikTok's own expert's testimony supports an inference that "performing a rule based substitution of one or more of the digital media assets from the first set of digital media assets with one or more of the digital media assets from the second set of digital media assets" was a non-conventional means for generating a user specific composite digital media display as claimed in claim 1 of the '030 patent.  At the very least, Dr. Bovik's declaration supports an inference that the "performing a rule based substitution" limitation is at a minimum, a non-

conventional and non-generic arrangement when used in a system for generating and presenting digital media content. Taking all inferences in favor of 10Tales—as the district court was required to do on a Rule 12 motion—the district court should have found, at a minimum, that there was a plausible factual dispute as to whether the ordered combination of claim elements recited in claim 1 of the '030 patent includes an inventive concept. *See BASCOM*, 827 F.3d at 1350.

"While prior cases can be helpful in analyzing eligibility," determining whether claim limitations either individually or as an ordered combination "involve an inventive concept that transforms the claim into patent eligible subject matter, must be decided on a case-by-case basis in light of the particular claim limitations, patent specification, and invention at issue." *CosmoKey*, 15 F.4th at 1099. Nevertheless, to the extent that prior cases are helpful, *BASCOM* and *Weisner* are instructive because the claims found to be eligible in those cases are analogous to claim 1 of the '030 patent.

The innovative concept recited in claim 1 of the '030 patent is much closer to the inventive concept in *BASCOM* than to any of the cases cited by either the district court or by TikTok. In *BASCOM*, the Court found that it was a "close call," but under step one the claims were directed to the abstract idea of "filtering content on the Internet." 827 F.3d at 1347–49. At step two, the Court construed the claims in favor of the non-movant (the patentee) and found that the limitations of the claims,

54

taken individually, recited generic computer, network, and Internet components, which were not inventive by themselves. *Id.* at 1349–52. However, the Court found that the ordered combination of these limitations provided the requisite inventive concept. *Id.* In doing so, the Court recognized that the "inventive concept inquiry requires more than recognizing that each claim element, by itself, was known in the art," and that "an inventive concept can be found in the non-conventional and non-generic arrangement of known, conventional pieces." *Id.*

This Court agreed with the district court "that the limitations of the claims, taken individually, recite generic computer, network and Internet components, none of which is inventive by itself. BASCOM does not assert that it invented local computers, ISP servers, networks, network accounts, or filtering." *Id.* at 1349. Nevertheless, this Court found that an inventive concept could be found in the non-conventional and non-generic arrangement of known, conventional pieces. In *BASCOM*, the non-conventional arrangement involved installing a conventional filtering tool that was conventionally installed on an end user's computer on an ISP server. According to the patentee, installing this conventional software on the ISP server rather than on the end user's computer made the Internet filtering system better because it allowed network administrators to control filters for multiple users without having to modify the software on each end user machine. *Id.* at 1344-45. This Court concluded that the patent-at-issue in *BASCOM* "was not claiming the idea

55

of filtering content simply applied to the Internet," but instead was "claiming a technology-based solution (not an abstract-idea-based solution implemented with generic technical components in a conventional way) to filter content on the Internet that overcomes existing problems with other Internet filtering systems." *Id.* at 1351.

Similarly, claim 1 of the '030 patent is not claiming the idea of "presenting personalized content to a user based on information about the user" simply applied to a network environment. Instead, the '030 patent claims a technology-based solution to existing technological processes for presenting personalized digital media content to particular individuals over a network that overcomes existing problems with conventional systems for providing such content.

Claim 1 is also analogous to claims that were held eligible in *Weisner v. Google LLC*, 51 F.4th 1073, 1087 (Fed. Cir. 2022). The specification for the '911 patent in *Weisner* emphasized that conventional web searches had a problem of returning voluminous, generic, and non-personalized search results. *Id.* Claim 1 of the '911 patent purported to solve this problem by using information regarding physical locations that the user conducting the search had previously visited ("location history") to prioritize the search result rankings. According to the patentee, the conventional method for conducting such a search relied exclusively on "virtual encounters"—that is, websites that the user had visited online as opposed to physical locations that the user had actually gone to in person.

The *Weisner* court concluded that by using the location history to improve the search results rather than relying on the conventional method of using "virtual encounters" only, the claims of the '911 patent "include an inventive concept that precludes an ineligibility determination at the pleadings stage." *Id.* In reaching its conclusion, the *Weisner* court found that the claims of the '911 patent were analogous to the claims that the Federal Circuit held were eligible in *DDR Holdings, LLC v. Hotels.com, L.P.*, 773 F.3d 1245 (Fed. Cir. 2014). The *Wesiner* court further held:

> [T]he record supports that **the claims plausibly provide a solution** to an Internet-centric problem regarding web searches, **allowing for more personalized search results than conventional methods**. And like the claims in *DDR*, the claims here avoid the *Ultramercial* problem of "broadly and generically claim[ing] 'use of the Internet' to perform an abstract business practice (with insignificant added activity)" because **they provide a "specific way" to solve the problem**—through the "reference individual."

*Weisner*, 51 F.4th at 1087–88 (citations omitted).

Similarly, here the record supports that claim 1 of the '030 patent plausibly provides a solution to a technology-centric problem regarding customizing and presenting digital media, allowing for more personalized digital media content than conventional methods. *See* Appx50-51, 2:3-11, 2:53-61, 2:65-3:17; Appx55, 11:65-12:46. Just as the use of the "location history" to prioritize search results in *Weisner*

57

provided a "specific way" to solve its problem, the ordered combination here that includes:  (i) **retrieving user social network information from at least one source external to the presented first composite digital media display, wherein the user social network information contains one or more user attributes**; (ii) **selecting based on the user attributes in the social network information, a second set of digital media assets associated with the one or more user attributes found in the user social network information**; and (iii) **performing a rule based substitution of one or more of the digital media assets from the first set of digital media assets with one or more of the digital media assets from the second set of digital media assets to create a user specific set of digital media assets**, provides a specific way to solve the computer-centric problem and improve existing technological processes for personalizing digital media.

In summary, claim 1 of the '030 patent plausibly includes more than merely the concept of "providing personalized digital media content to the user."  Instead, claim 1 adds significantly more to the abstract idea of "providing personalized digital media content to the user" by implementing a specific solution to a problem rooted in computer technology.  Accordingly, even if this Court were to conclude that claim 1 is directed to an abstract idea, which it is not, claim 1 is still patent eligible because the claimed invention amounts to significantly more than a patent on the abstract idea itself.  At a minimum, this Court should conclude that patent eligibility

in this case cannot be resolved at the Rule 12 stage because there is a plausible factual dispute after drawing all reasonable inferences from the intrinsic and Rule 12 record in favor of the non-movant, 10Tales.  *See Coop. Entm't*, 50 F.4th at 130; *Weisner*, 51 F.4th at 1087 ("[T]he record supports that the claims plausibly provide a solution to an Internet-centric problem regarding web searches, allowing for more personalized search results than conventional methods.").

## <u>CONCLUSION</u>

10Tales respectfully requests the Court to reverse the district court's Rule 12 decision that the '030 patent is not directed to patent eligible subject matter under 35 U.S.C. § 101, and remand this case for further proceedings.

Dated:  September 5, 2024

Corrected: December 27, 2024          Respectfully submitted,

By:   */s/ Thomas J. Fisher*
      Thomas J. Fisher
      Barry P. Golob
      COZEN O'CONNOR
      2001 M Street, NW, Suite 500
      Washington, DC  20036
      (202) 912-4800
      tfisher@cozen.com
      bgolob@cozen.com

      *Counsel for Appellant*
      *10Tales, Inc.*

**ADDENDUM**

1

2

3

4              UNITED STATES DISTRICT COURT

5              NORTHERN DISTRICT OF CALIFORNIA

6                    SAN JOSE DIVISION

7

8    10TALES, INC.,                          Case No.  21-cv-03868-VKD

             Plaintiff,
9
                                             **ORDER GRANTING DEFENDANTS'**
10        v.                                 **MOTION FOR JUDGMENT ON THE**
                                             **PLEADINGS**
11   TIKTOK INC., et al.,
                                             Re: Dkt. No. 206
12           Defendants.

13

14        Plaintiff 10Tales, Inc. ("10Tales") sues defendants TikTok, Inc., TikTok Pte. Ltd.,

15   ByteDance Ltd., and ByteDance, Inc. (collectively "TikTok"), alleging infringement of claim 1 of

16   U.S. Patent No. 8,856,030 ("the '030 patent"), titled "Method, System and Software for

17   Associating Attributes within Digital Media Presentations."  TikTok now moves pursuant to Rule

18   12(c) for judgment on the pleadings, arguing that the '030 patent is invalid because it claims

19   ineligible subject matter under 35 U.S.C. § 101.  10Tales opposes the motion.  Upon consideration

20   of the moving and responding papers, as well as the oral arguments presented, the Court grants

21   TikTok's motion for judgment on the pleadings, without leave to amend.

22   **I.    BACKGROUND**

23        The '030 patent issued on October 7, 2014, and claims priority to a provisional application

24   filed on April 7, 2003.  *See* '030 patent, cover page.  The patent concerns technology for

25   customizing or personalizing content based on user information.  The specification describes a

26   "method, system, and software . . . which allow for customizing and personalizing content based

27   on a combination of a user's demographics, psychodemographics, cognitive states, emotional

28   states, social placement and group interaction dynamics within an online community, and/or

affinity for certain content elements (images, sounds, segments, graphics, video, text, dialog), self-provided narrating content, internal narrative traits preference topology, and expectation level and temporal spacing of assets within the narrative." *Id*. at 2:65-3:7. Noting the "advent of the digital era" and "threat[s] [to] advertising," the '030 patent describes a need "to attract individuals to content that is personally more relevant and impactful for them and which may contain an advertising message (in the form of product placement), and have them receive that message in full, as opposed to skipping over all or a portion of the message." *Id*. at 1:52, 59, 2:3-7; *see also id*. at 1:58-61. The patent further notes an additional need "to have the ability to understand the individual's likes and dislikes or current mood in order to adapt the message appropriately for the individual at the time that they are receiving [content]," and "to change the content of the digital media narrative based on user [information]." *Id*. at 2:8-11, 55-56.

The claimed invention purports to provide an enriched user experience and more powerful media for content creators, such as advertisers and artists, through content that has greater impact on users. *See id*. at 3:63-4:14. Among the stated advantages of the claimed invention is that "it allows advertising to be inserted in subtle ways and presented in a context in which users may be able to fully engulf themselves into the lifestyle being positioned and portrayed by the brand," and users "are much more likely to be receptive to the message presented, and less likely to skip over or fast-forward through the content including the advertising." *Id*. at 4:3-7, 12-14.

10Tales contends that TikTok infringes claim 1 (*see* Dkt. No. 124 ¶¶ 50-77 & p. 20), the sole independent claim of the '030 patent, which recites:

> 1. A system for associating user attributes with digital media asset attributes and creating a user specific composite digital media display, the system comprising:
>
> a) a server;
>
> b) a computer-readable storage medium operably connected;
>
> c) wherein the computer-readable storage medium contains one or more programming instructions for performing a method of associating user attributes with digital media asset attributes and creating a user specific composite digital media display, the method comprising:
>
> identifying a first set of digital media assets stored on the computer-

readable storage medium,

creating, from the first set of digital media assets, a first composite digital media display,

presenting to the user via a display server, the first composite digital media display;

retrieving user social network information from at least one source external to the presented first composite digital media display, wherein the user social network information contains one or more user attributes;

selecting, based on the user attributes in the social network information, a second set of digital media assets, wherein the second set of digital media assets is associated with one or more user attributes found in the user social network information;

monitoring the first composite digital media display for the presence of a trigger, wherein the trigger indicates a personalization opportunity in the first set of digital media assets;

performing a rule based substitution of one or more of the digital media assets from the first set of digital media assets with one or more of the digital media assets from the second set of digital media assets to create a user specific set of digital media assets;

creating, from the user specific digital media assets, a user specific composite digital media display; and

presenting to the user via the display server, the second composite digital media display.

'030 patent at 20:62-22:15.

TikTok previously brought a Rule 12(b)(6) motion to dismiss 10Tales's complaint on the ground that claim 1 is directed to ineligible subject matter under 35 U.S.C. § 101. *See* Dkt. No. 132. Judge Gonzalez Rogers, who was then presiding over this action, initially observed that the '030 patent bore "relevant similarities to the patent in *Free Stream Media Corp., v. Alphonso, Inc.*, 996 F.3d 1355, 1362-65 (Fed. Cir. 2021)," which concerned a patent directed at the abstract idea of targeted advertising. *See* Dkt. No. 156 at 5. However, noting that the parties disputed not only "the basic character of the subject matter of the claimed invention," but also whether claim 1 of the patent "introduces technological improvements over the state of the art that were not conventional or generic at the time the patent issued," Judge Gonzalez Rogers ultimately concluded that claim construction was required to properly adjudicate the question of whether the '030 patent claims ineligible subject matter. *See id.* at 5-6. In particular, she noted that 10Tales

"argues that Claim 1 discloses a system for analyzing how a user interacts with others in a social network to determine a user's affinity for content and the use of a rule based algorithm to create a personalized digital media display for a particular user." *Id*. at 6. Accordingly, TikTok's Rule 12(b)(6) motion to dismiss was denied without prejudice. *Id*. at 7.

Upon the parties' consent, this action subsequently was reassigned to this Court for all purposes, including trial. 28 U.S.C. § 636; Fed. R. Civ. P. 72; Dkt. Nos. 174, 175. After holding a tutorial and a claim construction hearing (Dkt. Nos. 189, 190), the Court issued its claim construction order (Dkt. No. 204). TikTok then filed the present Rule 12(c) motion for judgment on the pleadings, arguing that claim 1 of the '030 patent is ineligible under 35 U.S.C. § 101.

## II.    LEGAL STANDARD

### A.    Rule 12(c)

A motion for judgment on the pleadings may be brought "[a]fter the pleadings are closed—but early enough not to delay trial." Fed. R. Civ. P. 12(c). Rule 12(c) motions test the legal sufficiency of a claim. *Chavez v. United States*, 683 F.3d 1102, 1108 (9th Cir. 2012). Such motions are "functionally identical" to those brought pursuant to Rule 12(b)(6), and "the same standard of review applies to motions brought under either rule." *Cafasso v. Gen. Dynamics C4 Sys., Inc.*, 637 F.3d 1047, 1054 n.4 (9th Cir. 2011) (internal quotations and citations omitted). Accordingly, the Court must "accept factual allegations in the complaint as true and construe the pleadings in the light most favorable to the nonmoving party," but need not accept as true conclusory allegations. *Manzarek v. St. Paul Fire & Marine Ins. Co*., 519 F.3d 1025, 1031 (9th Cir. 2008). The Court may consider materials subject to judicial notice without converting a Rule 12(c) motion into one for summary judgment. *United States v. 14.02 Acres*, 547 F.3d 943, 955 (9th Cir. 2008).

Judgment on the pleadings is proper when, taking all allegations in the pleading as true, the complaint does not plead "enough facts to state a claim to relief that is plausible on its face," and the moving party is entitled to judgment as a matter of law. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Stanley v. Trs. of Cal. State Univ*., 433 F.3d 1129, 1133 (9th Cir. 2006). "Thus, patent eligibility may be resolved at the

United States District Court
Northern District of California

Rule 12 stage only if there are no plausible factual disputes after drawing all reasonable inferences from the intrinsic and Rule 12 record in favor of the non-movant." *Cooperative Ent., Inc. v. Kollective Tech., Inc.*, 50 F.4th 127, 130 (Fed. Cir. 2022).

### B. Patent Eligibility Under 35 U.S.C. § 101

"Eligibility under 35 U.S.C. § 101 is a question of law, based on underlying facts," *SAP Am., Inc. v. InvestPic, LLC*, 898 F.3d 1161, 1166 (Fed. Cir. 2018), "[b]ut not every § 101 determination contains genuine disputes over the underlying facts material to the § 101 inquiry," *Trinity Info Media, LLC v. Covalent, Inc*, 72 F.4th 1355, 1360 (Fed. Cir. 2023) (internal quotations and citation omitted). "Like other legal questions based on underlying facts, [eligibility under § 101] may be, and frequently has been, resolved on a Rule 12(b)(6) or (c) motion where the undisputed facts, considered under the standards required by that Rule, require a holding of ineligibility under the substantive standards of law." *SAP Am., Inc.*, 898 F.3d at 1166 (citations omitted). As the moving party, TikTok bears the burden of demonstrating invalidity by clear and convincing evidence. *See* 35 U.S.C. § 282; *Microsoft Corp. v. i4i Ltd. P'ship*, 564 U.S. 91, 95 (2011).

The Patent Act provides that a patent may be obtained for "any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof[.]" 35 U.S.C. § 101. However, patent protection does not extend to claims that monopolize the "basic tools of scientific and technological work," and it is well settled that "[l]aws of nature, natural phenomena, and abstract ideas are not patentable." *Alice Corp. Pty. Ltd. v. CLS Bank Int'l*, 573 U.S. 208, 216 (2014) (quotations and citation omitted). Courts must nonetheless "tread carefully in construing this exclusionary principle lest it swallow all of patent law." *Id.* at 217. "At some level, 'all inventions . . . embody, use, reflect, rest upon, or apply laws of nature, natural phenomena, or abstract ideas.'" *Id.* (quoting *Mayo Collaborative Servs. v. Prometheus Labs., Inc.*, 566 U.S. 66, 71 (2012)). "Thus, an invention is not rendered ineligible for patent simply because it involves an abstract concept." *Id.*

Under the two-step framework described in *Alice*, the Court must first determine whether the claim at issue is "directed to a patent-ineligible concept." *Id.* at 218. If so, then at step two the

United States District Court<br>Northern District of California

5

Court must "examine the elements of the claim to determine whether it contains an 'inventive concept' sufficient to 'transform' the claimed abstract idea into a patent-eligible application." *Id.* at 221 (quoting *Mayo Collaborative Servs.*, 566 U.S. at 72-73). Specifically, the Court must determine "whether the claim elements, individually and as an ordered combination, contain an inventive concept, which is more than merely implementing an abstract idea using well-understood, routine, and conventional activities previously known to the industry." *Chewy, Inc. v. Int'l Bus. Machines Corp.*, 94 F.4th 1354, 1365 (Fed. Cir. 2024) (internal quotations and citation omitted).

## III.    DISCUSSION

TikTok argues that the '030 patent claims patent-ineligible subject matter because claim 1 is directed to an abstract idea under *Alice* step one and fails to recite an inventive concept under *Alice* step two. Dkt. No. 206 at 2. 10Tales responds that the '030 patent claims technological improvements for personalizing content based on information derived from how a user interacts with others in an online social network, such that it is non-abstract under *Alice* step one. 10Tales also argues that, in any event, the elements of claim 1, considered individually and as whole, embody an inventive concept that does not preempt the abstract idea itself under *Alice* step two. *See* Dkt. No. 215 at 2, 24.

### A.    *Alice* Step One

At step one of the § 101 analysis, courts "evaluate the focus of the claimed advance over the prior art to determine if the claim's character as a whole is directed to excluded subject matter." *Trinity Info Media*, 72 F.4th at 1361 (internal quotations and citations omitted); *see also Alice*, 573 U.S. at 217. "Courts must ascertain the basic character of the [claimed] subject matter without describing the claims at such a high level of abstraction and untethered from the language of the claims that the claims would be virtually guaranteed to be abstract." *Trinity Info Media,* 72 F.4th at 1361 (internal quotations and citations omitted). "[W]hile the specification may help illuminate the true focus of a claim, when analyzing patent eligibility, reliance on the specification must always yield to the claim language in identifying that focus." *Id.* (internal quotations and citations omitted).

United States District Court
Northern District of California

TikTok contends that claim 1 of the '030 patent essentially is directed to the abstract idea of targeted advertising. *See* Dkt. No. 206 at 10; Dkt. No. 216 at 4.  10Tales responds that claim 1 is directed to "a specific system for creating a more personalized set of digital media assets for a user based on retrieved user social network information," which it says is not abstract. Dkt. No. 215 at 18.  As described in the specification, the '030 patent purports to address a need to learn more about a user in order to provide a user with digital media content that is more personally relevant and impactful. *See* '030 patent at 2:3-4, 8-11, 55-56; *see also* Dkt. No. 215 at 15 (describing need addressed by '030 patent as "the desire to learn more about the user to identify content that will have a strong impact on that particular individual.").  TikTok is correct that the specification discusses problems facing advertisers, including the need to "attract individuals to content that is personally more relevant and impactful for them and which may contain an advertising message . . . and have them receive that message in full, as opposed to skipping over all or a portion of the message." *See* '030 patent at 1:41-2:61, 3:7-17, 3:63-4:14, 6:59-61, 8:44-47, 17:57-65.  However, claim 1 of the '030 patent is broader; it recites a system and software for "performing a method of associating user attributes" from "user social network information" with "digital media assets," and then creating and presenting a personalized "composite digital media display" to the user.  '030 patent at 20:62-22-15; *see also id.* 19:44-47 ("The invention is intended to cover any [digital media asset] actions that make the digital media asset video sequence **300** more connected to the viewer and enhance the experience.").

The Court agrees with 10Tales that claim 1 is not limited to advertising, and that the claim is more generally directed to a system for presenting personalized digital media content to a user based on the user attributes from user social network information.  However, claim 1 *is* limited to an abstract idea:  presenting personalized content to a user based on information about the user. The patent is not directed to any improvement in computer technology or network functionality, but instead claims a long-standing and fundamental practice of personalizing content based on user attributes that spans many domains. *See, e.g., Intell. Ventures I LLC v. Capital One Bank (USA)*, 792 F.3d 1363, 1369 (Fed. Cir. 2015) (observing "that newspaper inserts had often been tailored based on information known about the customer—for example, a newspaper might

1   advertise based on the customer's location."); *see also id.* at 1370 ("Tailoring information based

2   on the time of day of viewing is also an abstract, overly broad concept long-practiced in our

3   society. There can be no doubt that television commercials for decades tailored advertisements

4   based on the time of day during which the advertisement was viewed.").

5         As explained below, careful consideration of the claim language demonstrates that the

6   system of claim 1 recites only generic and conventional computer components, and the method it

7   performs is defined by purely functional elements.

8         As 10Tales correctly observes, claim 1 is directed to a system. Dkt. No. 215 at 18.

9   However, it does not follow, as 10Tales argues, that a system claim cannot be abstract. *See id.*

10  "'[N]ot every claim that recites concrete, tangible components escapes the reach of the abstract-

11  idea inquiry.'" *Affinity Labs of Texas, LLC v. Amazon.com Inc*., 838 F.3d 1266, 1269 (Fed. Cir.

12  2016) (quoting *In re TLI Commc'ns LLC Pat. Litig*., 823 F.3d 607, 611 (Fed. Cir. 2016)). Here,

13  the system of claim 1 recites a conventional computer system with generic components,

14  specifically "a server" and "a computer-readable storage medium" to which the server is "operably

15  connected," wherein the computer-readable storage medium contains "programming instructions

16  for performing a method." *See* '030 patent at 20:62-21:3. The specification makes clear no

17  specialized components are contemplated by the claimed invention. *See, e.g.,* '030 patent at Fig.

18  5A and 11:65-12:46 (describing a generic server as part of "context diagram" for one embodiment

19  of the claimed system); 16:1-4 ("The software may be executed on a compatible server

20  environment including a web server, servlet container, Structured Query Language (SQL)

21  database and Java Database Connectivity (JDBC) driver."); *see also id.* at Fig. 13 and 15:35-52

22  (describing generic computer system "for a realization of the server**"**).

23         As the claimed elements of the system are merely generic, conventional components, the

24  Court considers whether the asserted claim is directed to improvements in computer functions or

25  capabilities, or whether it merely uses the computer components as tools to perform a method that

26  is itself the abstract idea. *See Trinity Info Media,* 72 F.4th at 1362-63 ("In the context of software-

27  based inventions, *Alice/Mayo* step one often turns on whether the claims focus on the specific

28  asserted improvement in computer capabilities or, instead, on a process that qualifies as an abstract

United States District Court<br>Northern District of California

8

United States District Court
Northern District of California

1   idea for which computers are invoked merely as a tool.") (internal quotations and citations

2   omitted); *Affinity Labs of Texas*, 838 F.3d at 1270 ("In addressing the first step of the section 101

3   inquiry, as applied to a computer-implemented invention, it is often helpful to ask whether the

4   claims are directed to 'an improvement in the functioning of a computer,' or merely 'adding

5   conventional computer components to well-known business practices.'") (quoting *Enfish, LLC v.*

6   *Microsoft Corp.*, 822 F.3d 1327, 1338 (Fed. Cir. 2016)). Here, the method steps of claim 1 require

7   the computer system to perform the following functions by executing programming instructions

8   (i.e. software): identifying stored content, creating displays, presenting displays to a user,

9   retrieving information, selecting content, monitoring a display, and performing a substitution of

10  one set of stored content for another. *See* '030 patent at 20:62-22:15. The specification confirms

11  that all of these are routine computer functions. *See* '030 patent at 4:44-49, 12:6-10; 12:17-18;

12  12:23-37; 16:1-2; 16:16-22; 16:28-33; 20:62-22:15; Fig. 5A; Fig. 13.

13          Citing to the allegations of its operative amended complaint, 10Tales argues that the

14  claimed advance of the '030 patent lies in personalizing a digital media presentation "through the

15  social dynamics of the user as learned by the system," "analyz[ing] how that user interacts with

16  other users in an online social network," and the use of "a rule based algorithm." Dkt. No. 215 at

17  15, 16; Dkt. No. 124 ¶¶ 58-60.[1]  None of these alleged "improvements" is actually claimed.

18          First, with respect to 10Tales's assertion that the claimed system "learns" and "analyzes" a

19  user's interactions with others in an "online social network" and then retrieves information derived

20  from those interactions, claim 1 recites only "retrieving user social network information from at

21  least one source external to the presented first composite digital media display." *See* '030 patent

22  at 21:13-15. As construed by the Court, this element means "retrieving [*information derived from*

23  *a user's interactions in an online community*] from at least one source *other than* the presented

24  first composite digital media display." *See* Dkt. No. 204 at 17-22. In opposing TikTok's Rule

25  12(b)(6) motion before Judge Gonzalez Rogers, 10Tales argued that claim 1 recites an "improved

26

27  ---

    [1] Although 10Tales argues that, for present purposes, the Court must accept its allegations as true.
28  10Tales's allegations are entirely conclusory. *See* Dkt. No. 124 ¶¶ 58-60; *see also Simio, LLC v.*
    *FlexSim Software Products, Inc.*, 983 F.3d 1353, 1365 (Fed. Cir. 2020) (conclusory statements are
    disregarded when evaluating a complaint under Rule 12).

9

**Appx9**

system" in that it "retrieves social network information about the user and *analyzes how* that user interacts with other users in an online social network in order to determine the user's affinity for certain digital media content." *See id*. at 19:14-18, 20:4-8 (emphasis added). When Judge Gonzalez Rogers observed that the purported improvement was "not in the claims," 10Tales argued that construction was necessary with respect to the term "retrieving user social network information from at least one source external to the presented first composite digital media display." *See id*. at 20:10-21:5. However, in the claim construction proceedings before this Court, 10Tales did not argue for a construction of the "retrieving" term that included "analyzing," and the Court did not construe the term that way. *See generally* Dkt. No. 167 at 17, 19; *see also* Dkt. No. 206-1 at 109.

Moreover, as construed by the Court, "the term 'user social network information' addresses the *kind* of information being retrieved, i.e., 'information derived from a user's interactions in an online community." Dkt. No. 204 at 22. Nothing in the claim addresses *how* user attributes are derived from the user's interactions in an online community or *how* those attributes are used to determine the user's affinity for content. The specification is likewise silent regarding the how the system "learns" or "analyzes," as it provides only conceptual diagrams and descriptions of the "social" aspects of personalization. *See*, *e.g.*, '030 patent at Figs. 6, 8-9, 23; 13:11-36; 13:50-14:14; 20:9-37.

Second, with respect to 10Tales's assertion that the claimed system relies on a "rule based algorithm" to create a personalized digital medial display, claim 1 recites "performing a rule based substitution of one or more of the digital media assets from the first set of digital media assets with one or more of the digital media assets from the second set of digital media assets to create a user specific set of digital media assets." '030 patent at 22:7-11. In opposing TikTok's Rule 12(b)(6) motion before Judge Gonzalez Rogers, 10Tales argued that claim 1 requires the use of a rule based "algorithm." *See* Dkt. No. 206-1 at 23:13-24:14. However, in the claim construction proceedings before this Court, 10Tales did not argue for such a construction (*see* Dkt. No. 167 at 21), and the Court did not construe the term that way. The Court determined that the "performing" element did not require construction, observing only that "rule based" refers to "a substitution that happens by

1   application  of a rule, rather than on the basis of some discretionary or subjective determination."

2   Dkt. No. 204 at 25.  Indeed, 10Tales confirmed during the claim construction hearing that it did

3   not dispute the Court's interpretation of this element.  Dkt. No. 193 at 136:16-137:1, 140:20-

4   141:18, 143:18-22.  Thus, nothing in the claim requires a particular algorithm, nor is any such

5   algorithm described in the specification.

6          In sum, the system of claim 1 of the '030 patent recites generic and conventional computer

7   components, with programming instructions for performing a method with purely functional steps.

8   While "[s]oftware can make non-abstract improvements to computer technology just as hardware

9   improvements can, and sometimes the improvements can be accomplished through either route,"

10  *Enfish, LLC*, 822 F.3d at 1335, none of 10Tales's asserted "improvements" demonstrates an

11  improvement to computer functionality.  *See TecSec, Inc. v. Adobe Inc.*, 978 F.3d 1278, 1293

12  (Fed. Cir. 2020) ("We have found claims directed to such eligible matter in a number of cases

13  where we have made two inquiries of significance here: whether the focus of the claimed advance

14  is on a solution to *a problem specifically arising in the realm of computer networks or computers*,

15  and whether the claim is properly characterized as identifying *a specific improvement in computer*

16  *capabilities or network functionality, rather than only claiming a desirable result or function*.")

17  (internal quotations and citations omitted) (emphasis added).  10Tales asserts that its claimed

18  invention "improved upon conventional systems with an improved approach to personalizing

19  digital media content," i.e., "claim 1 recites that specific information from a source external to the

20  user's digital media presentation is obtained by the system to yield a desired result—a

21  personalized digital media presentation that will have a strong impact on the user[.]"  Dkt. No. 215

22  at 16.  However, nothing in claim 1 demonstrates how that result improves the operability or

23  capability of the recited system, beyond providing a user with personalized content using generic

24  processes and conventional computer components.

25         Thus, the present case is readily distinguishable from those in which the asserted claims

26  were directed to non-abstract improvements to the functionality of a computer or network platform

27  itself.  *See TecSec, Inc.*, 978 F.3d at 1295-96 (claims "directed to improving a basic function of a

28  computer data-distribution network, namely network security," where claim language and

United States District Court
Northern District of California

11

specification described a specific method of managing access to objects using multiple levels of encryption); *CardioNet, LLC v. InfoBionic, Inc.*, 955 F.3d 1358, 1370 (Fed. Cir. 2020) (claims "directed to a specific technological improvement—an improved medical device that achieves speedier, more accurate, and clinically significant detection of two specific medical conditions out of a host of possible heart conditions."); *Finjan, Inc. v. Blue Coat Sys. Inc.*, 879 F.3d 1299, 1304-05 (Fed. Cir. 2018) (claims directed to "'behavior-based' approach to virus scanning" that "employs a new kind of file that enables a computer security system to do things it could not do before," "enables more flexible and nuanced virus filtering," and "allows access to be tailored for different users and ensures that threats are identified before a file reaches a user's computer."); *Core Wireless Licensing S.A.R.L. v. LG Elecs., Inc.*, 880 F.3d 1356, 1362-63 (Fed. Cir. 2018) (claims directed to "a particular manner of summarizing and presenting information in electronic devices," resulting in "an improved user interface for electronic devices, particularly those with small screens" and "improves the efficiency of using the electronic device"); *Enfish, LLC*, 822 F.3d at 1337-38 (claims "specifically directed to a *self-referential* table for a computer database" that "functions differently than conventional database structures" and "achieves other benefits over conventional databases, such as increased flexibility, faster search times, and smaller memory requirements."); *DDR Holdings, LLC v. Hotels.com, L.P.*, 773 F.3d 1245, 1257-59 (Fed. Cir. 2014) (patent "recite[d] a specific way" of creating a hybrid web page to resolve a "particular Internet-centric problem").

The '030 patent, by contrast, more resembles the patent at issue *Freestream Media Corp.* and "does nothing more than implement a computer to achieve the abstract idea of providing" personalized digital media content to a user.  *Freestream Media Corp.*, 996 F.3d at 1365; *see id.* at 1358-59, 1362 (claims reciting a system using a "relevancy matching server" to deliver targeted data based on "content identification data" and a "relevancy factor" are "directed to the abstract idea of 'targeted advertising.'").  In *Free Stream Media Corp.*, the patentee asserted that the claimed invention "allows devices on the same network to communicate where such devices were previously unable to do so."  *Id.* at 1363.  The Federal Circuit concluded that this was not sufficient because "the asserted claims do not at all describe how that result is achieved" and "do

12

**Appx12**

not recite an improvement in computer functionality." *Id.* at 1363-64. Similarly here, 10Tales

asserts that the '030 patent recites "a technological improvement over conventional systems for

presenting personalized digital media to a user" to "yield a desired result—a personalized digital

media presentation that will have a strong impact on the user[.]" Dkt. No. 215 at 16, 17.

However, claim 1 does not describe an improvement in computer functioning; nor does it

describe, except at a very high level, how that desired result is achieved. *See Chewy, Inc.*, 94 F4th

at 1365, 1366 (claims that "broadly recite correlating advertisements with search results using a

generic process" are abstract and "[e]ven accepting that the claimed invention improves the

specificity and relevancy of online advertisements, this is at most an improvement to the abstract

concept of targeted advertising wherein a computer is merely used as a tool.") (internal quotations

and citation omitted); *Trinity Info Media*, 72 F.4th at 1363 (claims for poll-based networking

system matching users are directed to "abstract idea of matching based on questioning, not an

improvement to computer technology."); *Affinity Labs of Texas*, 838 F.3d at 1268, 1269-71 (claim

"directed to a network-based media system with a customized user interface," written in largely

functional terms, is directed to abstract "concept of delivering user-selected media content to

portable devices"; "[l]ike the basic concept of tailoring content to a user, . . . the basic concept of

customizing a user interface is an abstract idea.").

Other cases have similarly found that personalizing information based on information

about a consumer or user is an abstract idea. *See, e.g., In re Morsa*, 809 F. App'x 913, 917 (Fed.

Cir. Apr. 10, 2020) (claim reciting "a 'process' that 'transmit[s]' a 'request for demographic

and/or psychographic user information' to the user and then 'sav[es]' the user information on the

system to match the user to a specific advertiser."); *MyMail, Ltd. v. ooVoo, LLC*, No. 2020-1825,

2020-1826, 2021 WL 3671364, at *5 (Fed. Cir. Aug. 19, 2021) (claim that recites "collecting

information" by sending data "from a user device to a server," "analyzing information by, at the

server, determining from the collected information whether the user device should receive toolbar

update data," and "presenting the results by, at the user device, receiving the toolbar update data,

updating the toolbar automatically, and displaying the updated toolbar."); *Elec. Power Grp., LLC

v. Alstom S.A.*, 830 F.3d 1350, 1354 (Fed. Cir. 2016) (claims directed to "gathering and analyzing

13

information of a specified content, then displaying the results, and not any particular assertedly inventive technology for performing those functions."); *Ultramercial, Inc. v. Hulu, LLC*, 772 F.3d 709, 715 (Fed. Cir. 2014) ("The process of receiving copyrighted media, selecting an ad, offering the media in exchange for watching the selected ad, displaying the ad, allowing the consumer access to the media, and receiving payment from the sponsor of the ad all describe an abstract idea, devoid of a concrete or tangible application."); *Blackbird Tech LLC v. Cloudflare, Inc*., No. 17-cv-06112-VC, 2018 WL 10689659, at *1 (N.D. Cal. Feb. 12, 2018) (claim "directed to the abstract idea of monitoring a data stream and modifying that data when a specific condition is identified"); *OpenTV, Inc. v. Netflix Inc.*, 76 F. Supp. 3d 886, 893 (N.D. Cal. 2014) ("The concept of gathering information about one's intended market and attempting to customize the information then provided is as old as the saying, 'know your audience.'").

10Tales argues that the prosecution history of the '030 patent, and proceedings before the Patent Trial and Appeal Board ("PTAB") concerning TikTok's petition for *inter partes* review ("IPR") of the '030 patent, confirm that claim 1 represents an improvement over the prior art.[2]  In particular, 10Tales notes that the prior art did not teach "retrieving user social network information from at least one source external to the presented first composite digital media display, wherein the user social network information contains one or more user attributes."  Dkt. No. 215 at 22 (citing Dkt. No. 215-3).  Additionally, 10Tales notes that in the claim construction proceedings before this Court, TikTok's expert, Dr. Bovik, opined that "the process for extracting a user attribute from a user's interaction with a networked community would not have been well known in the art[.]"  Dkt. No. 185-3 ¶ 163; *see also* Dkt. No. 215 at 22 n.4.  However, "[t]he 'novelty' of any element or steps in a process, or even of the process itself, is of no relevance in determining whether the subject matter of a claim falls within the § 101 categories of possibly patentable subject matter."  *Diamond v. Diehr*, 450 U.S. 175, 188-89 (1981); *see also SAP Am., Inc.*, 898 F.3d at 1162 ("We may assume that the techniques claimed are [g]roundbreaking, innovative, or

_____

[2] The Court grants 10Tales's request to take judicial notice of records from the '030 patent prosecution history and IPR proceedings.  For the reasons discussed above, the Court nonetheless concludes that the purpose for which 10Tales cites those records is irrelevant to the resolution of the present motion.

14

**Appx14**

1    even brilliant, but that is not enough for eligibility.  Nor is it enough for subject-matter eligibility

2    that claimed techniques be novel and nonobvious in light of prior art, passing muster under 35

3    U.S.C. §§ 102 and 103.") (internal quotations and citations omitted); *Affinity Labs of Texas*, 838

4    F.3d at 1270 n.3 (expert statement re novelty properly disregarded because "the eligibility finding

5    does not turn on the lack of novelty of the claim; it turns on the fact that the claim is drawn to any

6    embodiment of an abstract idea.").

7         As claim 1 is directed to the abstract idea of providing personalized digital media content

8    to a user, the Court now turns to the *Alice* step two analysis.

9         **B.    *Alice* Step Two**

10        At this second step, the Court "analyze[s] whether there is an 'inventive concept' that takes

11   the claim into the realm of patent eligibility." *Free Stream Media Corp.*, 996 F.3d at 1361 (citing

12   *Alice*, 573 U.S. at 217-219).  Specifically, the Court "determine[s] whether the claim elements,

13   individually and as an ordered combination, contain an inventive concept, which is more than

14   merely implementing an abstract idea using well-understood, routine, [and] conventional activities

15   previously known to the industry." *Chewy, Inc*, 94 F.4th at 1365 (internal quotations and citation

16   omitted).  In the context of claimed computer-implemented innovations, "the mere recitation of a

17   generic computer cannot transform a patent-ineligible abstract idea into a patent-eligible

18   invention." *Alice Corp. Pty.*, 573 U.S. at 223.

19        TikTok contends that claim 1 does not recite anything more than a conventional

20   application of the abstract idea of personalizing content, using generic computer components.

21   10Tales maintains that the elements of claim 1, considered individually and as an ordered

22   combination, demonstrate that the claim is directed to patent-eligible matter.

23        According to 10Tales, the innovation of the '030 patent is that the claimed system retrieves

24   information about a user from user social network information, as reflected in the "retrieving" step

25   of claim 1:  "retrieving user social network information from at least one source external to the

26   presented first composite digital media display, wherein the user social network information

27   contains one or more user attributes."  *See* '030 patent at 21:13-16; *see also* Dkt. No. 215 at 16.

28   As construed by the Court, the term "user social network information" refers to "the *kind* of

United States District Court
Northern District of California

15

1    information being retrieved, i.e. 'information derived from a user's interactions in an online

2    community,'" and "[i]n context, the plain and ordinary meaning of 'source external' simply means

3    that the claimed information is retrieved from a source [that] is other than the presented first

4    composite display."  Dkt. No. 204 at 22.  The Court construed the term "retrieving user social

5    network information from at least one source external to the presented first composite digital

6    media display . . ." to mean "retrieving user social network information from at least one source

7    other than the presented first composite digital display.  *Id*.  The "retrieving" element is thus

8    recited as a generalized step for retrieving a kind of user information, using conventional computer

9    technology, without reciting a specific or innovative mechanism for doing so.  As discussed

10   above, nothing in claim 1 or the specification indicates that the "retrieving" limitation requires

11   improved computer technology, as opposed to available computer components and existing

12   functions, as tools in carrying out the recited method steps.  The Court finds nothing inventive in

13   the "retrieving" step of claim 1.  *See Alice*, 573 U.S. at 222 ("Simply appending conventional

14   steps, specified at a high level of generality" is "not *enough* to supply an inventive concept")

15   (internal quotations and citation omitted); *Free Stream Media Corp.*, 996 F.3d at 1366 ("But even

16   assuming the bypassing of mobile device security mechanisms had not been done before, there is

17   nothing inventive disclosed in the claims that permits communications that were previously not

18   possible.  Indeed, the claims simply recite the use of generic features, as well as routine functions,

19   to implement the underlying idea."); *Internet Patents Corp. v. Active Network, Inc*., 790 F.3d

20   1343, 1349 (Fed. Cir. 2015) ("The additional limitations of these dependent claims do not add an

21   inventive concept, for they represent merely generic data collection steps or siting the ineligible

22   concept in a particular technological environment.").  While 10Tales maintains that retrieving user

23   social network information was not known in the art, that alone is not sufficient to transform a

24   patent-ineligible abstract idea into a patent-eligible invention.  *See Ultramercial, Inc.*, 772 F.3d at

25   716 ("That some of the eleven steps were not previously employed in this art is not enough—

26   standing alone—to confer patent eligibility upon the claims at issue.").

27        Other individual claim elements similarly recite routine activity using the same generic

28   computer components, and do not provide a specific mechanism for achieving the recited results.

16

**Appx16**

For example, the first three elements[3] and the last two elements[4] of claim 1 recite "creating" a first and second composite digital media display and "presenting" them to a user "via a display server." As construed by the Court, the term "creating, from the first set of digital media assets, a first composite digital media display" means "creating, from the first set of digital media assets, a first composite digital media display that combines two or more digital media assets." Dkt. No. 204 at 12-13. Similarly, the term "creating, from the user specific digital media assets, a user specific composite digital media display" simply means "creating, from the user specific digital media assets, a user specific composite digital media display that combines two or more digital media assets." *Id.* at 13. The Court construed the term "display server" to mean "a 'server' in a *conventional* server-client model as understood by a person of ordinary skill in the art at the time of the invention, such that 'server' can be either a computer program, a physical computer capable of running a computer program, or a physical computer running a computer program." Dkt. No. 204 at 16 (emphasis added). The specification confirms that the claimed invention is intended for use "with any digital viewing or listening device," including "a Personal Computer (PC)," "laptop computer," "Personal Digital Assistants (PDAs), wireless telephones, MP3 players, and any other device utilized to view or listen to video and audio signals and that can carry on two way communications." *See* '030 patent at 20:38-44.

The "selecting,"[5] "monitoring,"[6] and "performing a rule based substitution"[7] steps

---

[3] *See* '030 patent at 21:7-12 ("identifying a first set of digital media assets stored on the computer-readable storage medium," "creating, from the first set of digital media assets, a first composite digital media display," and "presenting to the user via a display server, the first composite digital medial display.").

[4] *See* '030 patent at 22:12-15 ("creating, from the user specific digital media assets, a user specific composite digital media display" and "presenting to the user via the display server, the second composite digital media display.").

[5] *See* '030 patent at 21:17-22:2 ("selecting, based on the user attributes in the social network information, a second set of digital media assets, wherein the second set of digital media assets is associated with one or more user attributes found in the user social network information[.]").

[6] *See* '030 patent at 22:3-6 ("monitoring the first composite digital media display for the presence of a trigger, wherein the trigger indicates a personalization opportunity in the first set of digital media assets[.]").

[7] *See* '030 patent at 22:7-11 ("performing a rule based substitution of one or more of the digital

United States District Court
Northern District of California

similarly recite generalized result-based processes without a specific mechanism or method for accomplishing the recited result. As construed by the Court, a "trigger" is simply "an indication of a personalization opportunity" and the phrase "monitoring the first composite digital media display for the presence of a trigger" means "monitoring the first composite digital media display for the presence in the display of an indication of a personalization opportunity." Dkt. No. 204 at 24. While 10Tales contends that the claimed invention improved on conventional systems by using a "rule based algorithm" (*see* Dkt. No. 215 at 16), as discussed above, that asserted "improvement" is not in claim 1. Further, as construed by the Court the term "'rule based' simply refers to a substitution that happens by application of a rule, rather than on the basis of some discretionary or subjective determination." Dkt. No. 204 at 25.

In sum, each of the elements of claim 1 recite conventional steps and computer components, in general functional terms, that are insufficient to provide an inventive concept. *See Elec. Power Grp. LLC*, 830 F.3d at 1355 ("Nothing in the claims, understood in light of the specification, requires anything other than off-the-shelf, conventional computer, network, and display technology for gathering, sending, and presenting the desired information. . . . We have repeatedly held that such invocations of computers and networks that are not even arguably inventive are insufficient to pass the test of an inventive concept in the application of an abstract idea.") (internal quotations and citations omitted); *see also MyMail, Ltd.*, 2021 WL 3671364 at *7 (claim elements reciting "a user Internet device" and "a server" performing "routine functions like 'displaying a toolbar comprising one or more buttons,' 'sending a revision level' from the device to the server, 'determining' at the server whether the device needs an update, 'receiving' at the device 'toolbar update data,' and 'initiating' at the device 'an operation to update the toolbar data,'" "are either generic computer components or routine activity" that "are insufficient to supply an inventive concept."). *Cf. CosmoKey Sols. GmbH & Co. KG v. Duo Security LLC*, 15 F.4th 1091, 1098, 1099 (Fed. Cir. 2021) (patent claims satisfy inventive concept requirement where "claims and specification recite a specific improvement to authentication that increases security,

media assets from the first set of digital media assets with one or more of the digital media assets from the second set of digital media assets to create a user specific set of digital media assets[.]").

United States District Court
Northern District of California

1    prevents unauthorized access by a third party, is easily implemented, and can advantageously be

2    carried out with mobile devices of low complexity" and "the patent specification describes how

3    the particular arrangement of steps in claim 1 provides a technical improvement over conventional

4    authentication methods.").

5         There is also nothing inventive about the ordered combination of these elements.  While

6    "an inventive concept can be found in the non-conventional and non-generic arrangement of

7    known, conventional pieces," *BASCOM Global Internet Servs., Inc. v. AT&T Mobility LLC*, 827

8    F.3d 1341, 1350 (Fed. Cir. 2016), the elements of claim 1 are organized in an entirely

9    conventional way—i.e., creating and presenting a first composite digital media display; then a

10   "selecting" of a "second set of digital media assets" "based on the user attributes in the [user]

11   social network information" retrieved in an earlier step; "monitoring the first composite digital

12   media display for the presence of a trigger . . . indicat[ing] a personalization opportunity,"

13   "performing a rule based substitution . . . to create a user specific set of digital media assets," and

14   "presenting to the user . . . the second composite digital media display."  *See* '030 patent at 21:7-

15   22:15.

16        10Tales asserts that when "taken together as an ordered combination," claim 1 "recite[s] an

17   invention that is not merely the routine or conventional use of the Internet."  Dkt. No. 215 at 16

18   (quoting *DDR Holdings*, 773 F.3d at 1259).  However, 10Tales did not explain how or why that is

19   so.

20        In sum, claim 1 recites generic components that are used and combined in conventional

21   ways within a particular technological environment, none of which rises to an inventive concept.

22   Accordingly, the Court concludes that none of the elements of claim 1, considered individually or

23   as an ordered combination, constitute an inventive concept sufficient to transform the claimed

24   abstract idea of providing personalized digital media content based on user attributes from user

25   social network information into patent-eligible subject matter under § 101.

26        **C.    Leave to Amend**

27        In deciding whether to grant leave to amend, the Court must consider the factors set forth

28   by the Supreme Court in *Foman v. Davis*, 371 U.S. 178 (1962), and discussed at length by the

19

**Appx19**

1    Ninth Circuit in *Eminence Capital, LLC v. Aspeon, Inc.*, 316 F.3d 1048 (9th Cir. 2009). A district

2    court ordinarily must grant leave to amend unless one or more of the *Foman* factors is present:

3    (1) undue delay, (2) bad faith or dilatory motive, (3) repeated failure to cure deficiencies by

4    amendment, (4) undue prejudice to the opposing party, and (5) futility of amendment. *Eminence*

5    *Capital*, 316 F.3d at 1052.

6         For the reasons discussed above, TikTok has shown that claim of the '030 patent is

7    directed to patent-ineligible subject matter. In a summary footnote at the very end of its

8    opposition brief, 10Tales requests that if the Court determines that the '030 patent is directed to

9    ineligible matter, then 10Tales should be given "leave to amend its First Amended Complaint to

10   add facts that would survive a pleadings challenge[.]" Dkt. No. 215 at 25 n.5. 10Tales cites

11   *Aatrix Software, Inc. v. Green Shades Software, Inc.*, 882 F.3d 1121, 1128 (Fed. Cir. 2018) for the

12   general proposition that a district court abuses its discretion if it denies leave to amend where the

13   complaint's allegations, "if accepted as true, contradict the district court's conclusion that the

14   claimed combination was conventional or routine." As discussed above, 10Tales's allegations

15   regarding patent eligibility are conclusory, and there are no factual allegations from which the

16   Court plausibly may infer that claim 1 is non-abstract or inventive. On this record, the Court also

17   finds no genuine disputes about the underlying facts material to the § 101 inquiry. Moreover,

18   10Tales does not explain what it could do through an amendment to cure a defect in patent

19   eligibility. Because 10Tales has not identified specific facts that would change the Court's

20   analysis, the Court finds no basis to conclude that there are additional facts that could be alleged

21   on a further amendment to cure the defect in patent eligibility. Accordingly, 10Tales's request for

22   leave to amend is denied. *Trinity Info Media*, 72 F.4th at 1361 & n.3.

23   **IV.    CONCLUSION**

24        Based on the foregoing, TikTok's motion for judgment on the pleadings based on patent

25   ineligibility under 35 U.S.C. § 101 is granted without leave to amend. The Clerk shall enter

26   ///

27   ///

28   ///

United States District Court
Northern District of California

judgment accordingly and close this file.

**IT IS SO ORDERED.**

Dated: April 2, 2024

*Virginia K. DeMarchi*
Virginia K. DeMarchi
United States Magistrate Judge

United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| 10TALES, INC., | Case No. 21-cv-03868-VKD |
| Plaintiff, | |
| v. | **JUDGMENT** |
| TIKTOK INC., et al., | |
| Defendants. | |

On April 2, 2024, the Court granted defendants' motion for judgment on the pleadings. Dkt. No. 223. Pursuant to Federal Rule of Civil Procedure 58, the Court hereby enters judgment in favor of defendants and against plaintiff.

**IT IS SO ORDERED.**

Dated: April 2, 2024

Virginia K. DeMarchi
United States Magistrate Judge

US008856030B2

(12) **United States Patent**
Russek

(10) Patent No.: **US 8,856,030 B2**
(45) Date of Patent: **Oct. 7, 2014**

(54) **METHOD, SYSTEM AND SOFTWARE FOR ASSOCIATING ATTRIBUTES WITHIN DIGITAL MEDIA PRESENTATIONS**

(75) Inventor: **David J. Russek**, Maple Glen, PA (US)

(73) Assignee: **Sevenecho, LLC**, Norristown, PA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 1841 days.

(21) Appl. No.: **10/819,514**

(22) Filed: **Apr. 7, 2004**

(65) **Prior Publication Data**

US 2004/0199923 A1     Oct. 7, 2004

**Related U.S. Application Data**

(60) Provisional application No. 60/460,998, filed on Apr. 7, 2003.

(51) **Int. Cl.**
*G06Q 30/02* (2012.01)
*G06Q 30/00* (2012.01)
*G06F 17/30* (2006.01)

(52) **U.S. Cl.**
CPC .......... *G06F 17/30867* (2013.01); *G06Q 30/00* (2013.01); *G06F 17/30265* (2013.01)
USPC ........................................ 705/14.66; 705/319

(58) **Field of Classification Search**
CPC .......................... G06Q 50/01; G06Q 30/0269
USPC ........................................ 705/14, 14.66, 319
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 5,119,474 A | 6/1992 | Beitel et al. | |
| 5,586,967 A | 12/1996 | Davis | |
| 5,604,855 A | 2/1997 | Crawford | |
| 5,625,570 A | 4/1997 | Vizireanu | |
| 5,692,212 A | 11/1997 | Roach | |
| 5,725,472 A | 3/1998 | Weathers | |
| 5,734,795 A | 3/1998 | Rogers | |
| 5,751,953 A | 5/1998 | Shiels | |
| 5,754,787 A | * 5/1998 | Dedrick | 709/228 |
| 5,774,664 A | 6/1998 | Hidary | |
| 5,805,784 A | 9/1998 | Crawford | |
| 5,848,934 A | 12/1998 | Shiels | |
| 5,861,881 A | 1/1999 | Freeman | |
| 5,872,927 A | 2/1999 | Shiels | |
| 5,913,310 A | 6/1999 | Brown | |
| 5,918,603 A | 7/1999 | Brown | |
| 5,935,003 A | 8/1999 | Stephens | |
| 5,945,988 A | 8/1999 | Williams | |

(Continued)

FOREIGN PATENT DOCUMENTS

WO        0177939 A1      10/2001

OTHER PUBLICATIONS

Quintana, Y.: "Design of an Object-Oriented Multimedia Database for Personalize Multimedia News", Proc. 1996 Canadian Conf. on Electrical and Computer Engg., May 26, 1996-May 29, 1996; pp. 282-285, XP002460458, Calgary, Canada.

*Primary Examiner* — Donald L. Champagne

(74) *Attorney, Agent, or Firm* — Pepper Hamilton LLP

(57) **ABSTRACT**

Disclosed are a system, method and software to associate attributes with digital media assets. Digital media contains specific assets, such as images, that can be replaced with other assets. The system, method and software permit the association of attributes with specific assets. The association of attributes and assets enables the provision of content that is enhanced and more impacting for a user.

**2 Claims, 25 Drawing Sheets**



**US 8,856,030 B2**

Page 2

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 5,977,968 | A | 11/1999 | Le Blanc |
| 5,987,415 | A | 11/1999 | Breese |
| 5,999,172 | A | 12/1999 | Roach |
| 6,029,195 | A | 2/2000 | Herz |
| 6,078,936 | A | 6/2000 | Martin |
| 6,088,717 | A | 7/2000 | Reed |
| 6,120,846 | A | 9/2000 | Hin |
| 6,135,944 | A | 10/2000 | Bowman |
| 6,175,772 | B1 | 1/2001 | Kami |
| 6,190,314 | B1 | 2/2001 | Ark |
| 6,205,472 | B1 | 3/2001 | Gilmour |
| 6,222,925 | B1 | 4/2001 | Shiels |
| 6,249,780 | B1 | 6/2001 | Mizokawa |
| 6,293,904 | B1 | 9/2001 | Blazey |
| 6,306,077 | B1 | 10/2001 | Prab |
| 6,311,194 | B1 | 10/2001 | Sheth |
| 6,317,127 | B1 | 11/2001 | Daily |
| 6,330,595 | B1 | 12/2001 | Ullman |
| 6,345,288 | B1 | 2/2002 | Reed |
| 6,357,042 | B2 | 3/2002 | Srin |
| 6,421,669 | B1 | 7/2002 | Gilm |
| 6,425,825 | B1 | 7/2002 | Sitrick |
| 6,466,232 | B1 | 10/2002 | Newell |
| 6,499,741 | B2 | 12/2002 | Yamazaki |

| | | | | |
|---|---|---|---|---|
| 6,513,011 | B1 | 1/2003 | Uwakubo | |
| 6,513,069 | B1 | 1/2003 | Abato | |
| 6,520,905 | B1 | 2/2003 | Surve | |
| 6,526,395 | B1 | 2/2003 | Morris | |
| 6,527,700 | B1 | 3/2003 | Manico | |
| 6,529,864 | B1 | 3/2003 | Chase | |
| 6,545,209 | B1 | 4/2003 | Flannery | |
| 6,581,037 | B1 | 6/2003 | Pak | |
| 6,585,521 | B1 | 7/2003 | Obrador | |
| 6,604,091 | B2 | 8/2003 | Sadakuni | |
| 7,000,180 | B2 | 2/2006 | Balthaser | |
| 7,162,432 | B2 | 1/2007 | Mascarenhas | |
| 7,483,871 | B2 * | 1/2009 | Herz ..................................... | 1/1 |
| 8,635,649 | B2 * | 1/2014 | Ward et al. ..................... | 725/40 |
| 2001/0049588 | A1 | 12/2001 | Bausch et al. | |
| 2002/0013943 | A1 | 1/2002 | Haberman | |
| 2002/0092019 | A1 | 7/2002 | Marcus | |
| 2002/0122430 | A1 | 9/2002 | Haberman | |
| 2002/0159640 | A1 | 10/2002 | Vaithilinga | |
| 2003/0001880 | A1 | 1/2003 | Holtz et al. | |
| 2003/0009078 | A1 | 1/2003 | Fedorovskaya | |
| 2003/0036899 | A1 | 2/2003 | Leslie et al. | |
| 2003/0045957 | A1 | 3/2003 | Haberman | |
| 2003/0131351 | A1 | 7/2003 | Shapira | |
| 2003/0142689 | A1 | 7/2003 | Haberman | |
| 2004/0267816 | A1 | 12/2004 | Russek | |

* cited by examiner



*FIG. 1*



*FIG. 2*

MUSIC & LYRICS

302

300

PERSONALIZED (INTERNAL) USER STORY

306

NEW PERSONALIZED (INTERNAL) USER STORY

312

DIGITAL ASSET

324

0:23
A4

322

320

INTERNAL IMAGES AND EMOTIONS    304

NEW IMAGES AND EMOTIONS    310

*FIG. 3*



*FIG. 4*



*FIG. 5A*



*FIG. 5B*



*FIG. 6*



*FIG. 7*



*FIG. 8*



*FIG. 9*



*FIG. 10*

~1101

| USER ID | PASSWORD | E-MAIL |
|---------|----------|--------|
| 372915 | GOFISH | SMITH@ISP.NET |

~1111

| USER ID | PROFILE ELEMENT | KNOWN/UNKNOWN | IMPORTANCE |
|---------|-----------------|---------------|------------|
| 372915 | ART | KNOWN | MEDIUM |
| 372915 | BIRDS | UNKNOWN | |
| 372915 | APPLIANCES | KNOWN | LOW |

~1121

| USER ID | PROFILE ELEMENT | VALUE | RANK |
|---------|-----------------|-------|------|
| 372915 | ART | ABSTRACT | 3 |
| 372915 | ART | RENAISSANCE | 7 |
| 372915 | APPLIANCES | STOVE | 5 |

*FIG. 11*



**PERSON** ~ 1200

AFFINITY LIST
GET AFFINITIES
SET AFFINITIES

**PEOPLE GROUP**

1210 ~ SET OF PEOPLE

**EXPERIENCE** ~ 1220

GROUP OF PEOPLE
RECORDED AFFINITIES
MEDIA

1230 ~ **RECORDED AFFINITIES**

TYPE
AFFINITY

**AFFINITY** ~ 1240

NAME
DESCRIPTION
PARENT
CHILD
GROUP

*FIG. 12*



*FIG. 13*



*FIG. 14*



*FIG. 15*

AN AUDIENCE MEMBER MUST REGISTER PRIOR TO VIEWING AN IMI



*FIG. 16*

THE DYNAMIC PERSONALIZED CONTENT IS DETERMINED PER USER BASED UPON PROFILES THAT ARE CREATED FROM INTERACTIVE CHOICES.



THE IMI CREATIVE INCLUDES THE BLENDING OF ACTION AS WELL
AS IN DIGITAL VIDEO FORM.

*FIG. 17*



FIG. 18



*FIG. 19*



*FIG. 20*



FIG. 21



*FIG. 22A*



*FIG. 22B*

GOAL:
INCREASE NARRATIVE IMPACT
PROFILE CLASSIFICATION: NARRATIVE PERCEPTION IDENTIFICATION FRAMEWORK

| COGNITIVE AFFINITIES | EMOTIONAL AFFINITIES | SOCIAL AFFINITIES | SELF-NARRATING SELF MAINTAINING CONTENT | INTERNAL NARRATIVE TRAITS PREFERENCE TOPOLOGY | TIME SENSITIVE / EPISODIC & EXPECTATION SEQUENCING | COLLECTIVE COLLABORATIVE |
|---|---|---|---|---|---|---|
| NOT KNOW | NOT KNOW | NOT KNOW | NO CONTENT | ENGAGER | SEQUENCE ALIGNS (Y/N) WITH CULTURAL PSYCH OR EXPECTATION | SOCIALLY ENGAGED/ DEFINED |
| KNOWN SIGNIFICANT (+ OR - VALENCE) | LOW SIGNIFICANCE | LOW SIGNIFICANCE | APPROPRIATE CONTENT | BYSTANDER | | NO SOCIAL ENGAGEMENT |
| | MEDIUM SIGNIFICANCE | MEDIUM SIGNIFICANCE | NON-APPROPRIATE CONTENT | IDENTIFIER | OUTCOMES EXPECTATIONS/ SPEED, MOTION VARIANCE & OUTCOME VARIABLES | RELEVANCE OF SOCIAL ENGAGEMENT |
| | HIGH SIGNIFICANCE | HIGH SIGNIFICANCE | MEANING OF CONTENT THAT POPULATES OTHER FIELDS (CAPTURED WHEN SUBMITTED) | DETACHER | | NO CONTENT FROM OTHERS |
| | | ALL ABOVE WITH WHOM | | METAPHORICAL | INTENT VALENCING & INTENT ASSOCIATION | APPROPRIATE CONTENT FROM OTHERS (Y/N) |
| | | | | LITERAL | | NON-APPROPRIATE CONTENT FROM OTHERS (Y/N) |

*FIG. 23*

US 8,856,030 B2

**1**

# METHOD, SYSTEM AND SOFTWARE FOR ASSOCIATING ATTRIBUTES WITHIN DIGITAL MEDIA PRESENTATIONS

## CROSS-REFERENCE TO RELATED APPLICATIONS

This patent application claims priority to the provisional patent application entitled, "Method and System for Digital Entertainment Asset Personalization," filed Apr. 7, 2003, serial No. 60/460,998, which is incorporated by reference herein. This patent application is also related to the patent application entitled, "Method, System and Software for Digital Media Narrative Personalization," filed Apr. 7, 2004.

## BACKGROUND OF THE INVENTION

It has been stated that human thinking falls into one of two categories: reasoning and narrative, descriptive, contemplative thinking. Reasoning is the process that permits the acceptance of facts followed by a logical process to conclude a result, opinion, conclusion or decision. Narrative, descriptive, contemplative thinking corresponds to the storytelling process (including receiving of a story) and the thought processes associated with the reception of a story.

Text and stories (presented in various formats) can also be interpreted at various levels including the literal, ethical, historical and mystical levels. It is generally understood that texts and stories are read and interpreted in different ways including at the different levels. A story or narrative can have different meanings at different levels, different interpretations at different levels, and will be interpreted differently by different individuals at each of the levels. Additionally, an individual, based on their emotional or physical state, may interpret each level of a story differently. A person may react differently to a story based on their current emotional state, which may in fact change while they are receiving the story. In some cases, it may be possible to alter their emotional state while receiving the story to make them more receptive to a particular interpretation at one or more levels.

Advertising is typically a type of narrative in which the advertiser attempts to influence the recipient (viewer, reader, listener) in a way that creates a positive association with a product or in some cases attempts to influence the recipient to purchase the product. Humor is frequently used in advertising because it puts the recipient in a receptive state for a message regarding the product. As such, humor is already used to alter the emotional state of the recipient of the advertising. Such manipulation of the emotional state of the recipient is currently limited to simple manipulation through the presentation of the advertisement (narrative).

With the advent of the digital era, the number of ways to transmit and present advertisements has increased dramatically, with advertising being inserted into Web pages, being displayed as pop-up windows on Web pages, transmitted as streaming media over the Internet, presented as animation over the Internet, and inserted into television streams at central or distributed insertion points. The advent of the digital era also threatens advertising in that viewers can avoid advertisements by stopping pop-up windows, or skipping over the advertisements on a Personal Video Recorder (PVR).

Due to the rapid changes in technology, advertisers are being forced to take new approaches to advertising including product placement, in which products are advertised during an entertainment narrative (e.g. a sit-com) as opposed to in a separate advertisement. Advertisers are also exploring ways to draw viewers (or listeners) to content that is essentially

**2**

digital media narrative storytelling, typically in the form of music or a short story that would appeal to viewers. What is required are ways to attract individuals to content that is personally more relevant and impactful for them and which may contain an advertising message (in the form of product placement), and have them receive that message in full, as opposed to skipping over all or a portion of the message. It would be an additional benefit to have the ability to understand the individual's likes and dislikes or current mood in order to adapt the message appropriately for the individual at the time that they are receiving it.

Digital media narrative may include content, such as video, audio, and combinations thereof, that is distributed digitally and can be stored digitally. In some instances digital media narrative can be manipulated via computer without human interaction. Digital media narrative includes but is not limited to stories presented over the Internet, modifiable digital video including digital television and streaming media, presentations on web sites including animations, still images, sequences of still images, audio, textual presentations, and combinations of all of the abovementioned media.

Digital media narrative can be distributed in a multitude of ways, such as broadcasting over cable and satellite, the Internet, or on media such as optical disks (CDs or DVDs). Distribution of digital media narrative is a significant business and involves complex relationships between artists and record labels or film studios, producers, and a complete distribution chain that includes advertising, both in the form of advertising of the content itself as well as sponsored advertising that may be inserted into, or become part of the content such as product placement. Examples of sponsored advertising include the insertion of commercials into recorded materials or the use of sponsor's products (e.g., automobiles) in the narrative.

Digital media narratives may be directed at a segment of the market, but the segment that the digital media narrative material is directed to may be quite large. For example, an artist may create works that appeal to the 18-24 year old age group, but that group can include people with different interests from various countries and different economic classes.

Furthermore, when digital media narratives are used as part of advertising, that digital media narrative and the advertising may be directed at such a large market segment that it is difficult to keep the interest of individuals within that market segment. If a user goes to an Internet web site to view a recording of an artist, and in particular a sponsored work that contains advertising, that work (including the advertising) may be so generic that the user cannot respond to or relate to the work. Additionally, the user may experience different emotional states than another user, or the user may be in an emotional state that is different than the user's emotional state when the user previously viewed the material.

For the foregoing reasons, there is a need for a method, system, and software to enable a distributor of sponsored or un-sponsored digital media narratives to change the content of the digital media narrative based on user demographics, psychodemographics, emotional states, affinities (cognitive, emotional and social), self-narrating content classification, internal narrative traits preference topology, time sensitive, episodic expectation sequencing, and collective/collaborate attributes.

## SUMMARY OF THE INVENTION

A method, system and software are presented which allow for customizing and personalizing content based on a combination of the user's demographics, psychodemographics,

3

cognitive states, emotional states, social placement and group interaction dynamics within an online community, and/or affinity for certain content elements (images, sounds, segments, graphics, video, text, dialog), self provided narrating content, internal narrative traits preference topology, and expectation level and temporal spacing of assets within the narrative. In one embodiment, a user selects material for presentation and is presented with the dynamic digital media narrative and optional embedded advertising presented in a customized format that gives the user a personalized experience.

The system, method and software may support product placement type advertising by modifying both the product placement material as well as the narrative surrounding the product placement material. Appropriate advertising may be selected as well as selecting components for the narrative that supports the product placement advertising.

In one embodiment, the user accesses a website containing sponsored material and logs on to that website. Information regarding the demographics, psychodemographics, cognitive states, emotional states, social placement and group interaction dynamics with the online community, and/or affinity for certain content elements of the user is retrieved from storage. If the user is a new user, he or she is asked a series of questions, preferably through a form of media narrative, that would creatively ask the questions, in order to obtain key information that the system would then classify and include into the user's profile. These questions can include yes/no, multiple choice, like/dislikes ratings or any other type of personal assessment or individual and/or group question. Alternatively, the user may interact with the media narrative and the interactions may be used to create a user profile.

In one embodiment, the user requests that the material be played or displayed, and is simultaneously presented with that material and customized personalized graphics and video. In another embodiment, the user can interact with the graphics and video. By making certain choices, a profile of the user can be determined and updated and the content (including background material, primary video, overlay graphics and audio) modified appropriately, thus giving the user an enhanced narrative, and more meaningful and emotionally satisfying experience with respect to the viewed content. In both embodiments, the user profile can then be used to present the most appropriate digital assets to the subscriber, namely those with which the user has the highest affinity, or those which map well to the user's tendencies and temperament, which may be included in the user's internal narrative perception identification framework. The internal narrative perception identification framework may include a collection of attributes, qualities, and measurements regarding the user that allow for matching, correlation and/or selection of digital media assets that are appropriate for that user and the effective communication of the message.

In one embodiment, the user's demographics are used to determine personalized content. Demographics may include, and are not limited to, group affiliations, regional location, sex, sexual preference, age, family situation (married or single, children or no children), race or ethnic background, religion and socioeconomic condition. The user's demographics may be used alone, or in combination with the previously discussed techniques, to create the individual internal narrative perception identification framework.

One advantage of an embodiment of the method, system and software presented herein is that the user is presented with an enhanced experience of the creator's content that creates a greater emotional experience for the user and a more impactful narrative. This creates a more receptive state for

4

product placed advertising inserted into the content, for a direct advertisement, or for entertainment containing an advertising message. Another advantage of the method, system and software presented herein is that it allows advertising to be inserted in subtle ways and presented in a context in which users may be able to fully engulf themselves into the lifestyle being positioned and portrayed by the brand. By combining the personalized digital media narrative asset elements with product placement advertising, a more powerful media is created for the advertisers and the artists. Additionally, since users typically volunteer to see the content, including advertising, they are much more likely to be receptive to the message presented, and less likely to skip over or fast-forward through the content including the advertising.

In an alternate embodiment, users are presented with questions or chat like text based opportunities within a narrative to either share the emotional experience with other users or to comment on their own emotional experience. This enables a user to share an experience with friends or acquaintances or allows a user to "sit back and relax" while someone else controls the enhanced experience. In this embodiment, the personalized content is based on the learned social dynamics of the user.

Another embodiment includes a developer toolkit that allows a creative director to create trigger points in the material where digital assets such as overlay graphics, backgrounds, icons, text, sound, and/or product placement images can be inserted into the digital media narrative. The developer toolkit allows the creative director to create a map of the elements of the user's profile and his or her internal narrative perception identification framework topology to digital assets that may be created. The developer toolkit also provides for the ability to insert interactive material such as questions or interactive graphics, allowing for the updating and enhancements of the user profile based on the user's interactions. The toolkit further permits the creative director to create and link the digital assets to the material such that assets for which the user has a high degree of affinity or assets having a highest probability of matching a user's internal narrative perception identification framework topology can be selected at the trigger point.

One advantage of an embodiment of the method, system and software presented herein is that they may enable a central server or service to compile a user's internal narrative perception identification framework and to store the internal narrative perception identification framework as an internal narrative perception identification framework profile and allow this profile to track or follow the user as he or she peruses multiple digital media narratives. This enables the user to receive enhanced digital media assets and various narrative experiences and allows the service to be sold to advertisers that advertise on any web site or broadband IP-based distribution point.

These and other features and objects of the invention will be more fully understood from the following detailed description of the embodiments which should be read in light of the accompanying drawings.

In this respect, before explaining at least one embodiment of the invention in detail, it is to be understood that the invention is not limited in its application to the details of construction and to the arrangements of the components set forth in the description or illustrated in the drawings. The invention is capable of other embodiments and of being practiced and carried out in various ways. Also, it is to be understood that the phraseology and terminology employed herein, as well as the abstract, are for the purpose of description and should not be regarded as limiting.

US 8,856,030 B2

5

As such, those skilled in the art will appreciate that the concepts upon which this disclosure is based may readily be used as a basis for designing other structures, methods, and systems for carrying out the several purposes of the present invention. It is important, therefore, that the claims be regarded as including such equivalent constructions insofar as they do not depart from the spirit and scope of the present invention.

## BRIEF DESCRIPTION OF THE DRAWINGS

The accompanying drawings, which are incorporated in and form a part of the specification, illustrate embodiments of the present invention and, together with the description serve to explain the principles of the invention.

FIG. **1** illustrates a user-relationship diagram for an embodiment of the system;

FIG. **2** illustrates the representative components of a digital media narrative and the digital media assets;

FIG. **3** illustrates the creation of a personalized digital media narrative;

FIG. **4** illustrates the use of interactivity to create an enhanced user profile and an enhanced experience through a personalized digital media asset;

FIG. **5A** illustrates a context diagram for digital media narrative asset personalization;

FIG. **5B** illustrates potential databases that may be used in creation of the personalized digital media asset and the relationships between those databases;

FIG. **6** illustrates exemplary relationships between the social, emotional, and cognitive affinity elements;

FIG. **7** illustrates exemplary components of the cognitive element;

FIG. **8** illustrates exemplary components of the social element;

FIG. **9** illustrates exemplary components of affinity;

FIG. **10** illustrates a flowchart for the development of the components for a personalized digital media narrative;

FIG. **11** illustrates data structures for a relational database for linking components of a personalized digital media asset with affinities;

FIG. **12** illustrates an object oriented approach for linking components of a personalized digital media asset with affinities;

FIG. **13** illustrates a computer on which the invention can be built;

FIG. **14** illustrates the construction of an Interactive Musical Intersode (IMI);

FIG. **15** illustrates a registration screen for an IMI;

FIG. **16** illustrates a screen representing a personalized background in an IMI;

FIG. **17** illustrates a screen with personalized content in digital video form;

FIG. **18** illustrates a screen posing a question related to an IMI to a user;

FIG. **19** illustrates a screen posing a multiple choice question related to an IMI to a user;

FIG. **20** illustrates an alternative screen for posing a question related to an IMI to a user;

FIG. **21** illustrates a screen having a text communication window related to an IMI;

FIG. **22A** illustrates a flow chart for the operation of the screens shown in FIGS. **15-21**;

FIG. **22B** illustrates a flow chart for the operation of a fuzzy logic based Enhanced Director Agent (EDA); and

6

FIG. **23** illustrates a narrative perception identification framework that enables matching of digital media assets to individuals.

## DETAILED DESCRIPTION OF PREFERRED EMBODIMENTS

In describing an embodiment of the invention illustrated in the drawings, specific terminology will be used for the sake of clarity. However, the invention is not intended to be limited to the specific terms so selected, and it is to be understood that each specific term includes all technical equivalents which operate in a similar manner to accomplish a similar purpose.

With respect to the user, a number of terms are used that describe how the user is identified and profiled. As used herein the term "user identification" means a number, symbol, or alphanumeric sequence that identifies a single subscriber, a group of subscribers, a subset of subscribers, or a subscriber in a specific location or on a specific network.

The term "user profile" includes a stored or calculated profile that describes one or more aspects of the user, such as demographics, psychodemographics, and attributes. The profile can be determined from questions answered by the user, forms filled out by the user, and/or interactions of the user with the digital media narrative. Alternatively, the profile can be determined from the user's web surfing characteristics, shopping habits, television viewing habits, and/or actual purchases. Profiling of users based on these interactions, viewing habits, and purchases is well understood by those skilled in the art.

"User attributes" include aspects, characteristics, and qualities of the user that are useful for determining (matching, correlating, and selecting) digital media assets. These attributes may include characteristics such as affinities, likes or dislikes as described outside of affinities, perceptions, experiences, and other factors that play a role in determining the internal narrative perception identification framework.

The term "internal narrative traits preference topology" means a representation of personality, such as a representation that is similar to the Myers-Briggs personality classification scheme. However, the representation establishes a measure of the potential for impact on the individual as specifically applied to narrative and interactive narrative. The Keirsey temperament sorter is a personality test that scores results according to the Myers-Briggs personality classification scheme, and allows testing or classification to occur over the Internet. The Keirsey test allows viewers to create a personality inventory of themselves. The internal narrative traits preference topology thus provides for personality classification and gathers data from a variety of sources, including the individual's interactions with the interactive narrative. As can be seen in FIG. **23**, the personality classification deals with personality traits such as engager v. bystander, identifier v. detacher, metaphorical v. literal. Other classifications can be included to further define a personality. Defined topology is the equivalent of the internal narrative traits preference topology.

"Narrative content" includes content used for story telling including story telling containing direct advertising, product placement advertising, or combinations thereof. "Story based" content refers to content that tells a story, which either is based on fact or is fictitious in nature, as opposed to a simple recitation of product characteristics. This is not to imply that advertisements that contain product characteristics or facts cannot be story based, only that the story based content contains those characteristics or facts in the context of a story.

US 8,856,030 B2

7

"Trigger points" are occurrences or time points within a story or narrative content that may cause the recipient (viewer, reader, or listener) to take a particular interpretation at one or more levels or that may affect the user's emotional state. "Personalization trigger points" are those trigger points that allow for modification of the story or narrative content in support of customization of the content to match the internal narrative perception framework and appropriately influence the user.

"Episodic" content refers to narrative content or stories that contain episodes, which either are arranged in a time sequence or are accessible to the user individually. A time sensitive sequence or set of episodes includes narrative content or stories that create personalized impact if temporally or sequentially changed. For example, a time sensitive sequence may include a mystery or story with a surprise ending that, per individual, may vary with respect to timing of delivery (i.e., wait 3 seconds versus 5) to build the optimal level of anticipation per individual. FIG. 4 illustrates other aspects of time sensitive episodic & expectation sequencing.

"Self-narrating" refers to interjecting elements of a user's life into the narrative that the user is watching. Self-narrative techniques take stories related to the user's life in a deeper way. Users can provide self-narrative content that may be incorporated as narrative or digital media assets that may be included in personalized narrative. As an example, a user may upload a photo of himself and that photo may be used in a personalized narrative being presented to another user. This may occur when a user accepts membership in a group and agrees to share a viewing experience with another user. Self-narrative content may include audience-generated content. This content may be self-sustaining in that it can automatically be incorporated into numerous personalized narratives and add another life or perspective to the narrative, as opposed to simply being inserted or viewed at the direct request of a user.

A "self narrating audience generated content classification" refers to the labeling of a digital media asset such that the individual or group generating the asset is known, as well as the potential for using that asset. As an example, a user may provide a photo of himself, and indicate that that photo can be inserted into narratives presented to a select group of users or potentially all users. Similarly, the user may upload other digital imagery, text, video, or other material that serves as a background, an overlay or another element in a narrative. The classification of this material determines how and when it may be used.

"Significance of affinity" is a measure of the strength of affinity and is useful in determining the level of attraction an individual has for a particular element. As an example, a user that repeatedly selects oranges in an interactive presentation would have a higher probability of having a high level of affinity for oranges. The degree of significance may be related to the probability of having an affinity for an element.

"Association rules" provide the ability to match digital media assets to an individual, through a correlation of the attributes of the asset with the assets of the individual in order to provide the highest level of impact. The correlation of the attributes may consist of summing the number of matching attributes, identifying key attributes, or providing a true/false test for one or more attributes. A relative weighting scheme may be incorporated into the correlation to give preference to or emphasize certain attributes. Correlation thus refers to the process of matching or selecting a digital media asset based on the overlap between the attributes of the individual and the asset, with the goal of having a greater narrative impact.

8

A "collective/collaborative classification," as illustrated in FIG. 22B, describes one or more attributes related to an individual's dynamics within the community and the potential for content to be defined within that dimension. Collective/collaborative attributes are those specific measures of the individual's dynamics within the community.

An "affinity" is a measure of how much an individual is attracted to a particular element of a narrative. As an example, an individual who was always served fried eggs on Wednesdays by his/her mother may have fond memories of that experience and may have a positive affinity for fried eggs, in particular on Wednesday. Conversely, an individual who was forced to eat cold fried eggs as a punishment may have a negative affinity for fried eggs.

FIG. 1 illustrates a detailed diagram for an embodiment of the system, in which a creative director **110** creates the personalized content and distributor **102** distributes the personalized content that is viewed by a consumer **104**. Although FIG. 1 illustrates the creative director **110** and the distributor **102** as separate individuals or entities, the creative director **110** and the distributor **102** may be the same person/entity and have different economic arrangements with other users of the system. The creative director **110** works with the content assembly and distribution system **100** to take original content **114** produced by an artist **112** and create modified content **106**, which is viewed by a consumer **104**.

In terms of economic arrangements, in one embodiment, a sponsor **101** may provide financing **108** to one or more of the artist **112**, the creative director **110** and the distributor **102**, such that they have resources to provide media assets and to provide a viewing mechanism for the consumer **104**. In one embodiment, the artist **112** is a musician who provides songs and musical videos as original content **114**. In this embodiment, the sponsor **101** is a manufacturer, such as a manufacturer of consumer package goods who desires to advertise its products to the consumer **104**. The sponsor **101** provides financing to the artist **112** and the creative director **110**/distributor **102** to permit the creative director **110**/distributor **102** to create a database system and the appropriate digital media assets for personalized viewing by the consumer **104**.

In an alternate embodiment, the sponsor **101** finances the artist **112** to provide new material directly related to its product, which may incorporate elements of previously produced songs, videos or other artistic works. In this alternate embodiment, the sponsor **101** may retain a closer relationship with the artist **112** to produce content specifically for advertising its products. This content may be further personalized through the content assembly and distribution system **100** to produce modified content **106** for the consumer **104**. This modified content **106** is the personalized digital media asset.

Note that in the description set forth above, the artist **112** need not directly interact with or be financed by the sponsor **101**. Rather, one or more intermediaries, such as agents, producers, studios, distributors or other entities may represent the artist **112** to the sponsor **101**. Accordingly, the term "artist" is intended to include an actual artist and/or one or more such intermediaries.

FIG. 2 illustrates the representative components of a digital media asset including background images **200**, video sequences **204**, foreground images **202**, text **208**, branding graphics **206** and digital audio **210**. These elements may be combined to create digital media assets **212**.

Background images **200** for digital media assets **212** may be still graphic images or MPEG based images, desktop colors, flash files, patterns or any other types of images that are typically used as background elements within current or future digital media narrative experiences. Video sequences

US 8,856,030 B2

9
10

204 may be in the form of MPEG-2 or MPEG-4 video sequences, but may also be other types of video including but not limited to Real Video, AVI video, flash based video, animations, or other video sequences. Text 208 may include overlay text scrolling, masked text, and/or other types of textual messages that appear on a screen, such as tickertape messages that appear at the bottom of a screen. Branding graphics 206 may include icons, symbols, figurines or any other types of element that appear on a screen that are not typically thought of as video images. Foreground images 202 may include still images, such as photographs, drawings, animations or any other types of image, that are brought to the attention of a user in the foreground. Digital audio 210 may be any type of digital audio including MP3 audio or any other compressed or uncompressed digital audio streams, files or segments.

Although personalized digital media assets 212 are shown to have individual sets of frames, it is to be understood that the digital media assets may be a combination of all of the above aforementioned elements and may or may not contain individual frames, but may have certain points which delineate segments or pieces of the asset from the pieces, both temporally and in terms of content.

FIG. 3 illustrates the creation of a personalized digital media assets based experience. In FIG. 3, an initial digital media asset video sequence 300 is combined with music and lyrics 302 to create a modified digital media asset that is personalized or internal to a user. This personalized user story 306 may contain images, audio, text and/or other content 304 that is expected to elicit certain emotions in the mind of the user.

An affinity may be the extent to which something creates an impact on the user, based on the user's life experiences. As an example, an old T-shirt may remind a user of an individual that previously wore that T-shirt. This may be a strong affinity if that person was very significant to the user (e.g., a parent, a spouse or a child). In some cases the user may not have an affinity for that object but may subsequently develop an affinity based on something that the user sees. As an example, if the user sees a magazine cover with an attractive person wearing an old T-shirt, this may create a new affinity. As another example, hearing a song while on a first date with a future spouse may create a new affinity to that particular song or artist. The user may have strong emotional feelings upon hearing the song because the song prompts the user to recall the early dating experience. Affinities and the quality of affinity thus define the extent to which the object or, in the case of the present system, digital media assets have an impact on users. Since affinities constantly change and may depend on a user's emotional state as well as past experiences, the system may update user profiles to determine which digital media assets should be used to create stronger emotions in the user.

The personalized (internal) user story 306 may be what the user perceives the digital media asset to be and may depend, at least in part, on the emotional state, demographics, psycho-demographics, cognitive states, social placement and/or group interaction dynamics within the online community, affinity for certain content features and/or other factors particular to the user. Trigger points 320 may be presented such that the digital media assets are customized to provide the user with a new personalized (internal) user story 312. This new personalized (internal) user story 312 may be composed of new images, audio, text and/or other content that, based on a user profile, are expected to trigger affinity element emotions 310 that are newer and/or stronger than emotions 304 previously experienced by the user or the expected emotions if the media assets were not personalized.

Trigger points 320 provide the mechanism for content management and the creation of a more personalized digital media asset based on a user's personal experiences. Trigger points 320 can be placed at various points in the digital media content, based on determinations of the creative director 110/distributor 102. For example, the creative director 110/distributor 102 may decide to place trigger points 320 in the digital media content 300 so that they occur at various points in time, when a certain character appears on the screen, when certain text is displayed, when words are spoken or sung, or based on other features of the digital presentation. During presentation of the digital media content, when the presentation reaches a trigger point 320, a script or other software program is executed. The creative director 110 or the distributor 102 may customize the script for each trigger point 320. The script may cause a computing device to access a database containing profile data relating to the user, and, based on the user profile information, the script may cause the insertion and/or replacement of video, graphics, audio or other material in the digital presentation. Furthermore, the timing of the presentation including but not limited to playback speed or changing the sequence of the presentation may be altered.

For example, the creative director 110 may place trigger points 320 in a digital media asset video sequence 300 each time that a particular character appears on screen. When the character appears on the screen, the script may, for example, access the user profile database to determine whether the user responds favorably to the character. If the user responds favorably to the character, the script may cause the insertion of a product advertisement on a location in the video screen whenever the character appears on the screen. Conversely, if the user does not respond favorably to the character, the server may take no action, or the system may insert different content into the screen when the character appears. Another example of a trigger point 320 is a portion of the digital media content that contains "hidden" advertisement, such as a character driving a particular brand of automobile while background music is played. The trigger point in this case could include both the type of vehicle and the background music. Upon reaching the trigger point 320, a script is run determining which type of vehicle manufactured by the sponsor may connect with the user and which song among a group may have the most appeal or greatest affinity to the user. For example, certain users may have a strong connection to pickup trucks and country music while other users may respond to Sport Utility Vehicles (SUVs) and classic rock. Upon reaching a trigger point 320, the system may select the make of vehicle that the character drives, the type of music played in the background and the volume of the background music. The system could also access additional information outside of the user profile to determine whether insertion should occur. For example, if a first user's profile indicates that the user has an affinity for a second user, when the character appears on the screen the system may determine whether the second user is also viewing the presentation at the same time. If so, the system may place an icon on the screen to indicate to the first user that the second user is also viewing the presentation.

In addition to trigger points 320, flexible trigger points 322 may be utilized. Flexible trigger points 322 have the property that they may be moved in time or entirely deleted. Flexible trigger points 322 thus allow further personalization of the digital media asset experience based on specific assets of the user typically learned through typical activity of the user with digital media asset 212. Trigger points 320 and flexible trigger points 322 may include time stamps and trigger point IDs 324. As represented in FIG. 3, time stamps and trigger point

US 8,856,030 B2

11

IDs **324** may provide an indication of when the trigger point occurs **322** and the affinities associated with that user.

FIG. **4** illustrates a default experience **400** being shown to a user with interactive opportunities **402** in conjunction with trigger points **320**. The trigger points **320** may be used to present interactive opportunities **402** to the user. Based on the user's responses to these interactive opportunities **402**, an enhanced user profile **404** may be created. The enhanced user profile **404** may subsequently be used in conjunction with trigger points **320** to create a personalized experience **406**. Personalized experience **406** may include different content which is better suited to the user's demographics, psycho-demographics, cognitive states, emotional states, social placement and/or group interaction dynamics within the online community, and/or affinity for certain content elements.

For example, the default experience **400** may be a new music video having interactive opportunities **402** that include selecting whether the video contains scenes from Spain or Italy followed by selecting scenes from New York City or the Rocky Mountains. The user's selections may be stored and utilized in personalizing future presentations. For example, if a user selects that a character travels from Italy to the Rocky Mountains, the system may infer that the user enjoys mountain scenery and perhaps skiing. Upon viewing an advertisement for a soda, the digital content may include a skier stopping to drink the soda. Conversely, if the user preferred New York City, the digital content may contain a dancer at a club stopping to drink the soda.

In another embodiment, a new user is asked a series of yes/no questions, multiple choice and/or open-ended questions. For example, a user may be asked to answer questions within the context of the narrative such as: "What is your favorite animal?"; "Would you rather ride a motorcycle or drive a sports car?"; "Do you prefer blue, red, green or yellow?"; or "True or false, I like fishing?" Questions may include demographic questions, such as gender, age, ethnic background, income, education level and region of residence. A user may also be asked general questions about his or her mood, state of mind or personality traits. The answers may be compiled to create a user profile which includes demographic information and personal likes/dislikes. The demographic information may be used to select the appropriate general database to which a member belongs, such as young female or middle-aged male. The questions may be designed to gauge the user's personality traits and affinities, the user's emotional state and the user's emotional response to media content. The queries may be more abstract than direct questions, such as "Pick a happy color," "Choose a word that saddens you," or even something similar to projective psychological tests such as an ink blot test or word association test.

Demographic information may be compiled because an individual's demographics have a great affect on his or her interest. A middle-aged parent is more likely to be interested in family oriented media narrative while a single young-adult is more likely to be interested in more risque media narrative. Also, a user that is in the economic middle-class may be more interested in high-priced leisure activities such as golf or skiing, while a user that is in a lower economic class may be more interested in less costly activities, such as basketball. Compiling an individual's demographics lends a wealth of information on materials that are more likely to have a personal connection.

FIG. **5A** illustrates a context diagram for one embodiment of a digital medial narrative asset personalization system (server) **590**. In this embodiment, a user **501** receives the

12

assets that comprise the personalized digital media asset **212** (FIG. **2**), and supplies a user ID **520**, a password and interactions/choices.

The server **590** may develop the personalized digital media asset **212** from content **531** and the digital asset repository **541**. In one embodiment, the server **590** stores modified content in a modified content storage medium **551**. In an alternate embodiment, the modified content is not stored, and the personalized digital media asset is presented to user **501** via the server **590**.

Referring again to FIG. **5A**, the user may also participate in an online community **521** providing a user with the ability to interact with other users. In one embodiment, the online community **521** includes the ability to share a viewing or listening experience with another user, thus creating new affinities for the content of that viewing or listening experience.

In one embodiment, the user **501** provides a user ID **520**, a password **522**, and interactions/choices **524** to a server **590**. The user **501** may be presented with digital video **500**, digital audio **510**, background images **200**, foreground images **202**, text **208**, digital media graphics, digital animation, and/or branding graphics **206**. The user **501** may participate in an online community system **521** in which the server **590** sends the user ID **520** to the online community system and receives lists of community user attributes **515** and active vs. inactive status **517**. In this way, the server **590** may determine which users are online and which users may be able to share a personalized digital asset experience. Stored user profiles **561** are stored and the server **590** may access a user profile **560** using a user ID **520**.

Content **531** may also be stored and provided to the server **590** in the form of digital graphics or video **530** and/or digital audio **534**, optionally based on content requests **536**.

A digital asset repository **541** may receive asset requests **540** from the server **590** and may provide items such as background images **200**, foreground images **202**, text **208**, and branding graphics **206**.

In one embodiment, the modified content is stored in modified content storage **551** and includes a time index **550**, an asset ID **552**, a media ID **554**, a user ID **520**, digital video **500**, digital audio **510**, background images **200**, foreground images **202**, text **208**, and/or branding graphics **206**.

In an alternate embodiment, personalized digital media narrative is created from the content **531** and the digital asset repository **541**. The narrative may not be stored as modified content but may be directed at the user **501** without storage.

FIG. **5B** illustrates potential databases that may be used in the creation of the personalized digital media asset and the relationships between those databases. In FIG. **5B**, an Uber-director (Udir) **512** is used to create a user profile **561**. Security is maintained in the user profile **561** through the use of a profile security database **522** and security management system. The Udir **512** works in conjunction with an I/O map **513** to interface to other databases, such as a group and social dynamics database **518**. The group and social dynamics database **518** may permit the user to interact with other users of the digital media asset to determine the dynamics between that user and the group. The Udir **512** may also work with the digital based evolving nature of the story **516** to create the personalized digital media asset. The actual elements used to complete the digital media asset may be contained in digital asset repository **514**.

Referring again to FIG. **5B**, trigger points **320** may be used to create an experience **504**, which is viewed by an audience **502**. Trigger points **320** work in conjunction with the digital asset repository **514** to bring lists of online users and their comments **511** in at the trigger points **320**. Asset sequencing,

US 8,856,030 B2

13

14

timing and security 506 may also play a role in determining the final digital media asset which is presented as the experience 504 to the audience 502.

A user profile monitor 500 may also work to understand outside emotion and data mapping 528 to determine whom the user is connecting with online 526 and the traveling profile management 524, which may ensure that an individual profile travels from program to program. Each of these elements may act to create a more complete stored user profile 561 and thus a better customization of the experience 504.

FIG. 6 illustrates exemplary relationships between social, emotional and cognitive elements, all of which may define a user's affinities. As is understood by those skilled in the art, a user's reality may be determined by a number of elements including: his or her emotional attraction 604 to certain affinities 601 and elements that are presented; his or her interaction with others during consumption of an experience (which is the user's social element 602); and the user's cognitive element 603, which is his or her awareness and perception of the world around him or her. These three elements may form the basis for a user's reality as perceived by him or her.

The three elements, as illustrated in FIG. 6, may include elements of an "internal narrative perception identification framework topology," which determines the user's tendencies, temperaments and provides a classification so as to increase the digital media narrative impact through providing media elements. Other examples of the elements of the internal narrative perception identification framework (see FIG. 23) include social/collective attributes, time sensitive, episodic and expectation sequencing, self-narrating content classification, the user's tendency to be literal vs. metaphorical, an identifier vs. a detacher, or an engager vs. a bystander. These elements of personality are well known by those skilled in the art and are exemplary only. Other attributes may be used to define the user's internal narrative perception identification framework topology.

Referring to FIG. 7, exemplary components of the cognitive 603 element may include: analytical skills 702 or the ability of a user to become consciously aware of elements that are being delivered and to analyze elements that he or she perceives; verbal processing 704 or the ability to verbalize his or her reality; inferencing 706, in which individuals infer the meaning of certain elements based on other elements; visualization 708 of elements of the reality; the understanding and reception of speech 710; the user's ability to compute things 712; the user's ability to communicate in written language and/or acquire new information 714; the user's preference in method of acquisition of information 716; the users' ability to reason by analogy 718; and the user's ability to quantify 770.

FIG. 8 illustrates exemplary social elements 602 and their components therein. These components may include: the groups 802 that the user is affiliated with; a social perception identification framework 804, such as a user's on-line personality or alter ego; the social personas 808, which are how people perceive that user; a user's social affinities 806; the level of involvement 810 that the user has with other individuals; the relationship 812 the user has with other individuals, the modes of interaction 814 or how the user communicates and interacts with other individuals; the ability of the user to be apt or, alternatively, inept in performing functions, such as social interaction 816; the attitudes 818 the user has; and internal narrative perception identification frameworks 820.

FIG. 9 illustrates exemplary components of affinity 601, including cultural affinities 902 in which the user is associated with a particular culture or race; artistic affinities 904; his or her digital media narrative (entertainment) likes and dislikes 906; his or her geographical affinities 908; the dates and events that are important to that user 910; his or her sensation and perception of the world 912, his or her iconographic perception of the world 914; and his or her individual affinities 916. These affinities may determine how a user perceives the world and may represent the particular elements that allow a user to influence other human beings. Users perceive or receive a sensation, consciously or unconsciously create the basis for emotions, and provide a catalyst for thoughts and emotions that are stored in the brain through an n-Gram encoding, ultimately placing the experience in a user's memory. By having knowledge of a user's affinities, it may be possible to influence the user by creating a closer bond through personalization to make a narrative experience more meaningful to that user.

FIG. 10 illustrates a detailed flow chart for an embodiment of the development of the components for a personalized digital media asset. Referring to FIG. 10, the creative director 110 may watch and listen to content in step 1000 and subsequently tag the time indices with affinities in step 1010. A test 1020 may then be performed to determine if sufficient tagging has taken place. This step may include comparing the number of tags set to a minimum threshold value or determining if all of the tags determined by a test sequence have been set. If further tagging is needed, a return to step 1010 occurs. If sufficient tagging 1020 has occurred, the affinities may be edited and associated with certain digital media assets in step 1030. Step 1030 may represent the affiliation of tags to trigger points 320 having certain affinities, such that based on a user's profile and interaction it becomes possible to retrieve the appropriate components of the digital media asset 212 to create a personalized experience. Subsequent to the creation of the affinities, the tags may be stored in step 1040 and the interactions may be created in step 1050, which may result in the development of collateral materials for narrative marketing in step 1060.

FIG. 11 illustrates exemplary tables for a user profile when the user profile is stored in a relational database. A first table 1101 may contain a user ID, password, and e-mail address of a user. A second table 1111 may contain the user ID, a particular profile element, a known/unknown status field, and an importance field. The second table 1111 may tabulate profile elements pertaining to the user. Profile elements may include any number of affinities previously discussed, internal narrative perception identification framework profile elements, or any other attributes of the user. A third table 1121 may contain the user ID, one or more profile elements and a value ranking for each profile element. The value may indicate that the user has an affinity for that particular type of profile element and the ranking of that value. As illustrated in FIG. 11, aspects of the user's affinity for art may be known. These aspects may have been determined by one of the methods detailed earlier. In the example shown, it is known that the user has an affinity for abstract and renaissance art. In one embodiment, the rank column of the third table 1121 is used to represent the strength of a positive affinity. In this embodiment, the ranking indicates that the user likes renaissance art more than abstract art. In another embodiment, the rank column of the third table 1121 is used to illustrate how strong the affinity is with that particular value. In such an embodiment, higher rankings do not indicate stronger positive preferences, but rather indicate stronger impact data structures for relational databases used to link components for personalized digital media assets with affinities.

FIG. 12 illustrates an object-oriented approach for storing user profile elements and linking components of a personalized digital media asset with affinities. Using an object-oriented approach, a person object 1200, containing a profile of

US 8,856,030 B2

15

16

elements and set element commands, may be created and related to a people group object **1210**. A people group object **1210** may also be related to an experience object **1220**, which contains aspects of the profile element including the name and description of the profile element as well as its relationship to other objects, which allows retrieval of recorded affinities **1230**. Individual affinities **1240** may be separate objects that contain specific elements known to be important to that user.

The database structures illustrated in FIGS. **11** and **12** are exemplary only, and illustrate certain aspects of the user profile and his or her affinities for certain objects and shared experiences that are part of his or her social interactions. Regardless of the particular database structure used, some or all of the aspects of the user's reality described earlier may be captured in a database to permit a user's profile to determine digital media assets that have a strong impact on that user. The optimization process of finding the strongest or most appropriate affinities and best match to the user's internal narrative social perception identification framework **804** may be based on a number of algorithms. Exemplary algorithms may include look-up tables, in which values of profile elements are matched to digital media assets, and correlation algorithms, which correlate profile elements, values, and ranks with profile elements, values, and ranks for a digital media asset to determine the best digital media asset to present. Other techniques for matching the user profile to the digital media asset may include neural networks and fuzzy logic, wherein aspects of the user profile are used to train the network or as inputs to the fuzzy logic system to determine the best digital media asset. Other types of artificial intelligence techniques, well known to those skilled in the art, may also be used to find the digital media asset, or sets of digital media assets, that have the largest impact on that particular user.

FIG. **13** illustrates a block diagram of a computer system for a realization of the server **590** based on the reception of multimedia signals from a bi-directional network. A system bus **1320** transports data among the CPU **1312**, the RAM **1308**, Read Only Memory-Basic Input Output System (ROM-BIOS) **1324** and/or other components. The CPU **1312** accesses a hard drive **1300** through a disk controller **1304**. Standard input/output devices are connected to the system bus **1320** through the I/O controller **1316**. A keyboard may be attached to the I/O controller **1316** through a keyboard port **1336** and the monitor may be connected through a monitor port **1340**. A serial port device may use a serial port **1344** to communicate with the I/O controller **1316**. Industry Standard Architecture (ISA) expansion slots **1332** and Peripheral Component Interconnect (PCI) expansion slots **1326** allow additional cards to be placed into the computer. In an embodiment, a network card is available to interface a local area, wide area, or other network.

Software to provide the functionality for a personalized digital media asset creation may be developed using a number of computer languages such as C, C++, Perl, Lisp, Java and other procedural or object oriented languages. Different programming languages may be used for different aspects of the system, such that a first programming language may be used for the content creation process illustrated in FIG. **10** and a second programming language may be used for the determination of the digital media assets to present to the user.

In one embodiment, the software may be a web-based application containing program modules. The program modules may include Java servlets, Java Server Pages (JSPs), HyperText Markup Language (HTML) pages, Joint Photographic Expert Groups (JPEG) images, Macromedia Flash MX movies, and/or a reusable Macromedia Flash MX com-

ponent. The software may be executed on a compatible server environment including a web server, servlet container, Structured Query Language (SQL) database and Java Database Connectivity (JDBC) driver.

The Macromedia Flash MX movies and the reusable Macromedia Flash MX component may include multiple Macromedia Flash MX source files. A programmer may supply a first file that contains code for a Time Frame component and/or a reusable Flash MX component that implements the user side of the trigger point **320**. An implementation may include visually framing the image to be displayed and resizing the image to be displayed to fit the frame, if necessary. For example, a programmer may supply a second file that includes code having two Time Frame instances and three buttons per Time Frame, the buttons including a "Warmer" button, a "Colder" button and a "Reset" button. The "Warmer" button may set a variable indicative of an affinity value to a lower value and load an image (or images) from the server that correspond to the new variable value. Similarly, the "Colder" button may set the affinity value variable to a higher value and load an image (or images) from the server that correspond to the new variable value. The "Reset" button may reset the variable to a mid-range value or the previously stored value for the user. As an alternative to the second file, a third file may be stored including a Time Frame instance, a "Load preferred image" button and two or more text entry boxes. The user may utilize text entry boxes to enter, for example, an affinity group name and a username. When the user enters valid information into both text entry boxes and clicks on the "Load preferred image" button, the information may be sent to the server. The server may use a database table to select an image based on the received information and may return the selected image to the user.

The application software may include multiple database tables such as tables of internal narrative perception identification frameworks, current users, user specific social affinities, user specific emotional affinities, and/or trigger points. In an embodiment, the application software may include a table that specifies an image that best represents the element for a specific affinity element group and affinity element.

The application software may include one or more HTML pages used to access the Macromedia Flash MX source files and to update the stored user Profile. The application may include one or more Java servlets. In an embodiment, a first Java servlet is utilized to find the affinity elements having the maximum value for the specific user, among all affinity elements in a specified group, and return the image corresponding to that element having the maximum value. In the embodiment, a second Java servlet is utilized to display the affinity values for the user, the affinity type and the affinity element group and to provide a means for the creative director **110** to update the affinity values.

The application software may include a plurality of JPEG image files that are provided from one or more sources. The sources may include any public source of image files, public copyrighted files with an appropriate copyright agreement or private files

FIG. **14** illustrates the construction of an Interacting Musical Intersode (IMI). When used herein, Interactive Musical Intersode (IMI) may refer to an embodiment of a personalized digital media narrative program that is used to create a personalized internal narrative experience for the user. Referring again to FIG. **14**, a window **1400** is presented which contains the IMI **1420** and a toolbar **1410** for the construction of the IMI **1420**. In one embodiment, the creative director **110/** distributor **102** views the elements which comprise the digital media asset repository. In an embodiment, these elements

17

include audio **1430**, video option/graphic option track **1 1432**, which comprises background option 1, video option/graph option track **2 1434**, which comprises background option 2, overlay text option **1 1436** and overlay text option **2 1438**. In one embodiment, each of these digital media asset options is linked to an affinity, such that switching can occur between these elements at the appropriate trigger points **320**. In one embodiment, the IMI is realized using Flash such that overlays are created and switching occurs between background overlays and the appropriate audio to create the IMI **1420**.

FIG. **15** illustrates an exemplary registration screen of an IMI in which an audience member is presented with a log on window **1520** in order to view the IMI. In an embodiment, having the user log on creates the ability to either retrieve information about that user from the database or create a new entry in the database about the user.

FIG. **22A** is a flow chart that illustrates an embodiment of the present system at work. A user may access a network or website at step **2200**. The network or website may determine whether the user is a new user or a repeat user at step **2205**. This check may include reviewing the user's cookies or simply asking the user to enter user identification (e.g. username and password). If the user is a repeat visitor, the user may be asked to input a user name and password at the login step **2210**. The user profile may then be loaded into the system. If the user is a new user, a user profile may be created at step **2220**. The created user profile may then be loaded into the system. In an embodiment, the created profile contains at least a username and a password. The profile optionally includes demographic data such as the user's gender, age, regional location and ethnic background. At step **2230**, the user may select a digital media presentation. As the digital media experience begins, the default digital media presentation may be presented for the user's viewing and/or listening pleasure. During the viewing of the digital media presentation, at step **2240** the trigger points **320** may be compared with the tags **1010** stored in the user's personal profile to determine if the default digital media asset video sequence **300** should be changed. If no tag **1010** is present for the tested trigger point, the digital media asset video sequence **300** may be viewed unchanged until the next trigger point **320**. If a tag is present, the content of the digital media may be changed according to the stored user's personal profile **561**.

In one example, an advertiser that manufactures various types of pet food, including dog food and cat food, forms an agreement with a record label that distributes music videos on the Internet for free viewing. A new music video of a popular artist may include a scene, segment or image having a dog or cat walk across the background to eat from a bowl of food or simply have a dog or cat graphic. Sitting next to the bowl of food is a bag labeled with one of the advertiser's brand name of pet food. Upon entering the website, the user's personal profile may be accessed. The profile may include information that the individual is a dog lover and/or dog owner. During playback of the video, a selection of the species of animal may be determined at the trigger point **320** based on the viewer's profile. For example, a tag **1010** in the profile may indicate to insert a dog into the video. Insertion of a dog into the media as opposed to a cat increases both the effectiveness of the advertising, by allowing the advertiser to highlight dog food to a dog lover, and the enjoyment of the video, since a dog lover is more likely to enjoy a music-based digital media experience featuring a dog. Thus, both the advertiser and the artist may benefit from the enhanced digital media being presented to viewers. Furthermore, the personal profile may further indicate a preferred breed of dog, such as golden retriever or terrier. If such information is specified, the specific breed of

18

dog or cat may be inserted at the trigger point **320**. The affinity of the user to the breed of animal may result in the user feeling more personally connected to the video.

FIG. **16** illustrates exemplary digital media assets in the form of specialized background materials **200** illustrating one part of the world (the continent of South America) and background materials **200** including a woman's eye and face. In the event that it is determined from the user profile that the user has an appropriate (or positive) affinity for South America, this background may be selected for presentation. Similarly, the woman's eye (or eye color) and face (or hair color) may be selected if it is determined that they would create a better emotional experience for the user. By providing this material to that particular user an enhanced emotional experience may occur for the user.

FIG. **17** illustrates a screen with personalized content in the form of digital media in which an automobile segment produced by the creative director **110** is shown on the screen along with a young man and a young woman. In one embodiment, these images are produced in conjunction with the audio, such that the user hears the artist's song and sees this specialized content and background material to create an emotionally enhanced experience. In one embodiment, the digital assets used to create the personalized digital media asset are selected based on the user profile and the ability to optimize the emotional experience for the user. These assets may include the make and/or color of the automobile, the ethnic background of the young man and young women, and even the color of the eye in the background.

FIG. **18** illustrates a screen posing a question relating to an IMI to a user. In this screen, the user is asked a question **1820** and can respond in textual form. The system may use the response to determine the user's perception of the IMI and consequently the user's preferences within the media narrative form. The system may further assess the user's potential affinity and add it to the user's profile.

FIG. **19** illustrates a screen posing a multiple choice question **1902** relating to a media narrative experience. The user may respond to the question by selecting an answer. The selected answer may provide information to the system regarding the user's desires, preferred affinities and other internal narrative perceptual identification based attributes. In FIGS. **18** and **19**, digital media assets are presented on the screen and may be customized according to the updated user's profile based upon the answers to those or previous questions posed to the user.

FIG. **20** represents an alternative screen for posing questions **2002** within a digital media asset based experience to a user in which the user is asked to respond to a particular question and a particular character **2004**, in this case from a TV series. Upon responding, the system may store information about the user and update the experience or presentation based on the current answer.

FIG. **21** illustrates a screen having a "chat type" window **2102** relating to an experience in which case the user can communicate with other users of the same experience. One advantage of this embodiment is that the users can share their comments on that experience with each other in either an anonymous or non-anonymous format. In another embodiment, users can simultaneously log on to an experience in a customized format. In this embodiment, the users can communicate with each other through a chat type window, e-mail, instant messenger, or other communication mechanism to discuss their emotional experience and put themselves into the story or the narrative experience. Such communication

US 8,856,030 B2

**19**

may allow users with higher social tendencies to have an enhanced experience and be more receptive to the sponsor's involvement as a result.

The screens of FIGS. **15-21** maybe enhanced by operation of a fuzzy logic based Enhanced Director Agent. FIG. **22B** illustrates an embodiment of the operation of a fuzzy logic based Enhanced Director Agent (EDA) for Digital Media Assets (DMA) "action" in a dynamically delivered digital media narrative platform. Audience interactions and/or inputs are normalized in step **2250** and the normalized inputs are stored in individual profile population files **2260**. The profile population per individual may be used to evaluate inputs and to infer mixture of digital internal narrative perception identification framework profile elements, including internal narrative perception identification framework, per individual in step **2270** and sends this information to the digital asset evaluation step **2280**. At step **2280**, the creative director **110** evaluates the digital asset classification **2275** to infer a mixture of DMA asset preferences. This mixture may be used to form a priority of digital internal narrative perception identification framework profile elements at step **2285**. At step **2290**, the priority of DMA action is determined using the individual digital internal narrative perception identification framework profile. The DMA may include aspects such as audio, graphic, animation features, video features, the timing of the audio and/or video and any other transformable aspect of the DMA. At step **2295**, the DMA action is set to correspond to each individual digital internal narrative perception identification framework profile according to the highest probability for personal preference and enhanced audience identification.

The DMA action may include changing any aspect of the digital media narrative that enhances the experience without destroying the integrity of the narrative experience. The action may include time sensitive changes, such as the changing of events, the playback speed, the timing of playback or the sequence of events such as changing the orientation of "scenes." The action may include changing the audio including the volume of playback, the score (i.e., the background music), the language spoken or even the accent of the speaker. The action may include changing the video aspect such as the gender, race or age of a character, the background scenery, the elements of the episode (e.g., a motorcycle, bicycle or horse is ridden), the color of clothing worn, an overcast or sunny sky, or any other visual aspect of the DMA. The invention is intended to cover any DMA actions that make the digital media asset video sequence **300** more connected to the viewer and enhance the experience.

In an embodiment, the DMA actions are logical and do not break the flow of a narrative or an episodic narrative. In other words, in an embodiment, a changed aspect does not destroy the plotline of a story and does not introduce a character or element that has no logical reason for appearing in the frame. For example, in this embodiment, it would not be appropriate to change the background scenery to a cityscape if the character is shown wearing skis, conversely changing the background to a mountain while the main character is carrying shopping bags would destroy the flow of the DMA.

Another collaborative aspect may include enabling another user to control the digital media presented to the user. A first user may experience a digital media narrative that includes the aforementioned automatic enhancements and allows for personal selection of events/media content. The first user may enjoy the content so much that he or she wishes to share the experience with select friends, family or colleagues. The user may save the personalized digital media and enable selected individuals to share the experience by informing the system. The first user may set a security level for further sharing. A

**20**

low security level may allow general access to the digital media narrative and enable secondary viewers to share the personalized digital media narrative with other viewers. A high security level may limit viewing of the digital media content to users having a direct relationship to the first viewer. A medium security level may limit access to viewers having either a direct link to the first viewer or an indirect connection, such as a friend-of-friend connection.

FIG. **23** illustrates a narrative perception identification framework that enables matching of digital media assets to individuals. The framework may be broken down into, for example, seven subsections: cognitive affinities, emotional affinities, social affinities, self-narrating self-maintaining content, internal narrative traits preference topology, time sensitive/episodic and expectation sequencing, and collective/collaborative. Each of these subsections may be assigned a value for a particular user. In an embodiment, cognitive affinities may be assigned a value defining whether an affinity is unknown or whether the person has a positive or negative affinity for a digital media asset. In an embodiment, unknown, low, medium, and high affinities may also be assigned to emotional and social affinities. In an embodiment, the self-narrating self-maintaining content may have no content, appropriate content, non-appropriate content, or the meaning of content that populates other fields. In an embodiment, time sensitive/episodic and expectation sequencing may determine whether the sequence aligns with cultural or psychological expectations, speed, motion variance and outcome variables for outcome expectations, and/or intent valencing and intent association. In an embodiment, the collective/collaborative subsection may determine whether the individual is socially connected with other users, the definition and relevance of such connections, and whether the individual prefers to receive content from others. The collective/collaborative subsection may include a determination of whether appropriate content or inappropriate content should be displayed.

It should be noted that the invention is not limited to viewing on a Personal Computer (PC) or laptop computer but is intended for use with any digital viewing or listening device. This includes, but is not limited to, televisions, Personal Digital Assistants (PDAs), wireless telephones, MP3 players and any other device utilized to view or listen to video and audio signals and that can carry on two way communications.

The many features and advantages of the invention are apparent from the detailed specification. Thus, the appended claims are intended to cover all such features and advantages of the invention which fall within the true spirits and scope of the invention. Further, since numerous modifications and variations will readily occur to those skilled in the art, it is not desired to limit the invention to the exact construction and operation illustrated and described. Accordingly, all appropriate modifications and equivalents may be included within the scope of the invention.

Although this invention has been illustrated by reference to specific embodiments, it will be apparent to those skilled in the art that various changes and modifications may be made which clearly fall within the scope of the invention. The invention is intended to be protected broadly within the spirit and scope of the appended claims.

What is claimed is:

**1**. A system for associating user attributes with digital media asset attributes and creating a user specific composite digital media display, the system comprising:

a) a server;

b) a computer-readable storage medium operably connected;

US 8,856,030 B2

21

c) wherein the computer-readable storage medium contains one or more programming instructions for performing a method of associating user attributes with digital media asset attributes and creating a user specific composite digital media display, the method comprising:

identifying a first set of digital media assets stored on the computer-readable storage medium,

creating, from the first set of digital media assets, a first composite digital media display,

presenting to the user via a display server, the first composite digital media display;

retrieving user social network information from at least one source external to the presented first composite digital media display, wherein the user social network information contains one or more user attributes;

selecting, based on the user attributes in the social network information, a second set of digital media assets, wherein the second set of digital media assets is asso-

22

ciated with one or more user attributes found in the user social network information;

monitoring the first composite digital media display for the presence of a trigger, wherein the trigger indicates a personalization opportunity in the first set of digital media assets;

performing a rule based substitution of one or more of the digital media assets from the first set of digital media assets with one or more of the digital media assets from the second set of digital media assets to create a user specific set of digital media assets;

creating, from the user specific digital media assets, a user specific composite digital media display; and

presenting to the user via the display server, the second composite digital media display.

**2**. The system of claim **1** wherein the first set of digital media assets includes one or more of a foreground image, a background image, or audio.

\* \* \* \* \*

## <u>CERTIFICATE OF SERVICE</u>

I, Thomas J. Fisher, hereby certify that on December 27, 2024, I served the foregoing Corrected Brief for Appellant on all counsel of record by filing the document with the United States Court of Appeals for the Federal Circuit using the CM/ECF system.

Dated: December 27, 2024  By: */s/ Thomas J. Fisher*
           Thomas J. Fisher
           COZEN O'CONNOR
           2001 M Street, NW, Suite 500
           Washington, DC  20036
           (202) 912-4800
           tfisher@cozen.com

           *Counsel for Appellant*
           *10Tales, Inc.*

## **CERTIFICATE OF COMPLIANCE**

Pursuant to Federal Rule of Appellate Procedure 32(g) and Federal Circuit Rule 32(b)(3), I hereby certify that the foregoing Corrected Brief for Appellant complies with the type-volume limitation of Federal Circuit Rule 32(b)(1). According to the Word count feature of Microsoft Word, this brief contains 13,837 words, excluding portions exempted by Federal Rule of Appellate Procedure 32(f) and Federal Circuit Rule 32(b)(2). The brief has been prepared in a proportionally spaced typeface using Times New Roman in 14 point size.

Dated:  December 27, 2024         By:    */s/ Thomas J. Fisher*
                                                Thomas J. Fisher
                                                COZEN O'CONNOR
                                                2001 M Street, NW, Suite 500
                                                Washington, DC  20036
                                                (202) 912-4800
                                                tfisher@cozen.com

                                                *Counsel for Appellant*
                                                *10Tales, Inc.*